W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

BASIC INCORPORATED, a corporation, Defendant.

Civ. No. 1782.

United States District Court
D. Nevada.

July 22, 1966.

warned by the Chief Chemist of the imminence of passage in Congress of the Equal Pay Act of 1963, remarked, "The Congress would never pass such a foolish law as that."

This "foolish" law [1] is now before the Court for interpretation, uninfluenced by the rightness or wrongness of the policy considerations which led to its enactment. The case for the plaintiff was presented by a feminine attorney of the Department of Labor, resisted by a masculine attorney of the Nevada Bar, and considered by a Judge who, for the purposes of this case at least, must be sexless, a possibility not apparent when the oath of office was taken and one which may bespeak the appointment of older judges.

When the law was approved on June 14, 1963, to become effective June 14, 1964, the defendant corporation maintained a laboratory at its plant at Gabbs, Nevada, where it mined, milled and refined ores and produced refractory materials for use primarily in the steel industry. There is no issue and no doubt that defendant was engaged in the production of goods for commerce and that the laboratory analysts are covered employees within the provisions of the Fair Labor Standards Act.

The laboratory at Basic is staffed with two chemists, three analysts, two to four sample preparation employees, and a secretary, and from time to time, trainees and others may be employed. The chemists are salaried, supervisory employees not covered by the Act. Some of Basic's employees are employed under the aegis of a collective bargaining agreement, but

Altero D'Agostini, Regional Atty., and Mildred Y. K. Lau, Atty., United States Dept. of Labor, San Francisco, Cal., for plaintiff.

Woodburn, Forman, Wedge, Blakey, Folsom & Hug, Reno, Nev., for defendant.

## OPINION

THOMPSON, District Judge.

The Manager of the Western Division of defendant, Basic Incorporated, when

1. 29 U.S.C. § 206(d) (1): "No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee."

no such agreement is applicable to the laboratory analysts.

The employees involved in the instant dispute are laboratory analysts Jo Ann Barredo, Ann Jones and Byron O'Dell. Barredo[2] was hired by Thompson, the then Chief Chemist, on September 1, 1959, and was trained under his supervision to perform the analytical tests required to determine the metallurgy of the various ores and compounds required to be analyzed. She had had no previous experience. Jones was hired by Thompson in 1953 and was trained by him. She had had no previous experience. O'-Dell was hired by Thompson in March, 1962. He was trained by Thompson, with the assistance of Barredo and Jones, in the particular analytical procedures used at Basic. In his early life, he had been employed as a miner and mill superintendent and from 1949 until 1962, was employed by Standard Slag Co. at Gabbs, Nevada, as a laboratory analyst, using similar analytical procedures to those used at Basic to determine the metallurgy of similar ores and products.

The wages paid these respective employees during the relevant period are as follows:

Barredo was employed at the rate of $2.74 per hour from June 11, 1964 to July 1, 1964; at the rate of $2.89 per hour from July 1, 1964 to August 17, 1964; at the rate of $3.16 per hour from August 17, 1964 to July 1, 1965; and at the rate of $3.31 per hour since July 1, 1965.

Jones was employed at the rate of $525 per month (or the equivalent hourly rate of $3.028 per hour) from June 11, 1964 to January 1, 1965; at the rate of $545 per month (or the equivalent hourly rate of $3.144 per hour) from January 1, 1965 to January 1, 1966; and at the rate of $560 per month (or the equivalent hourly rate of $3.2375) since January 1, 1966.

O'Dell has been employed by defendant as an analyst in its laboratory at Gabbs, Nevada from March 26, 1962 to the present. He was employed at the rate of $3.16 per hour from June 11, 1964 to July 1, 1964; at the rate of $3.31 per hour from July 1, 1964 to July 1, 1965; and at the rate of $3.46 per hour since July 1, 1965. Whenever O'Dell worked the swing shift, he received additional compensation at the rate of 5 cents per hour as a shift differential for work performed on the swing shift.

The primary work of all three laboratory analysts is the running of relatively simple, standarized chemical tests on various materials performed strictly in accordance with the company's testing manual and directives.

Barredo and Jones work only a day shift (8 a.m. to 12 m.; 1 p.m. to 5 p.m.) Every two weeks, O'Dell works a swing shift (12 m. to 9 p.m., with an hour off for dinner). The swing shift was instituted August 31, 1964, and is alternated between O'Dell and Christensen, a chemist, for two week periods. Christensen is a salaried supervisory employee who receives no extra compensation for his swing shift service. O'Dell is paid five cents per hour additional for swing shift work, this being the same wage differential provided by collective agreements for swing shift work of other plant employees. The orderly flow of work through the plant results in some differences in the kinds of materials analyzed by O'Dell when on swing shift, as compared with day shift, but the tests are the same as all the laboratory analysts are qualified to and do perform from time to time. Generally, the routine analytical work in the laboratory is divided among the analysts and each is expected to maintain proficiency in every testing procedure not reserved for the chemists. In late 1965 and early 1966, however, the Chief Chemist, Lawson, on instructions from the Plant Manager, assigned to O'Dell the analysis of a fifty-car shipment of magnesite to Australia, and the analysis of iron ore samples.

2. Although courtesy may suggest the propriety of identifying females with a prefatory "Miss" or "Mrs.", all employees will be called by their surnames in deference to the concept of equality.

The other analysts, Barredo and Jones, were equally qualified to perform these procedures and the assignment to O'Dell of the foreign shipment was for the expressed purpose of having one person responsible.

The male technicians in the "back room" preparing ore samples work under the supervision of a foreman and the Chief Chemist in the daytime. Their work continues until 10 or 10:30 at night. From 5 p.m. until 9 p.m., they are supervised by the swing shift analyst, O'Dell, or Chemist Christensen, as the case may be, in the sense that such person is then in charge of the laboratory although a minimum of supervision is required.

Gabbs, Nevada is a mining community, population 796, in a fairly remote, mountainous area, and it is reasonable, in respect of the safety of women (and ignoring their equality) that late evening and night work should be assigned exclusively to men in a mill and plant where the very great preponderance of workers is men.

After the passage of the Equal Pay Act of 1963, the then Chief Chemist, Thompson, discussed with his superiors the necessity of either equalizing the pay of the laboratory analysts or setting up legal job classifications of jobs requiring different skill, effort or responsibility or which were to be performed under different working conditions, but no final action was taken. Thompson resigned before September 1, 1964, and the present Chief Chemist, Lawson, succeeded him. Some time during his tenure, Lawson produced a "Job Description-Laboratory" (Ex. DD in evidence) which is copied in the footnote .[3] There is no evidence that this classification of work was ever put into effect or that wage scales were established for each classification. For example, Barredo and Jones are still paid at different rates, although both are presumably "analysts", and without explanation for the difference.

The defendant's Answer to the Complaint, after denying any discrimination among employees on the basis of sex, affirmatively alleges: "Any lesser pay re-

---

3. "JOB DESCRIPTION — LABORATORY. SHIFT ANALYST: Performs quantitative tests as assigned. Must be able to analyse for the following factors: Ignition loss, $SiO_2$ determination, $Fe_2O_3$ determination, $Cr_2O_3$ determination, $CaO$ (wet and flame), $Al_2O_3$ determination, Insol. determination, $CO_2$ determination, Boron determination, $P_2O_5$ determination. Must be able to determine Tectum reactivity and old and new hydration and to test for viscosity.

"A shift analyst must be available for night shift work and he will be in charge of the sample preparation section when a chemist is not on duty. He must be able to do the work required in the sample preparation section if necessary.

"The shift analyst must be able to go to the Mill section and gather the necessary samples and lift up to 50 lbs on occasions.

"JOB DESCRIPTION — LABORATORY. ANALYST: Performs quantitative tests as assigned. Must be able to analyse for the following factors: Ignition loss, $SiO_2$ determination, $Fe_2O_3$ determination, $Al_2O_3$ determination, $Cr_2O_3$ determination, $CaO$ (wet and flame), Insol. determination and $P_2O_5$ determination. Must be able to determine Tectum reac-

tivity and old and new hydration and viscosity.

"JOB DESCRIPTION — LABORATORY. JUNIOR ANALYST: Performs less complicated and analytical procedures. Must be able to conduct CaO Wet and flame tests. A junior analysts must be able to analyse for insol. determination. He must be able to determine distilled water conductivity, tectum reactivity, old and new hydration, wettability and viscosity. Other duties include weighing and brushing screens. Must be able to calculate sreen sizes.

"LABORATORY CLERK: High school graduate with a clerical background. Fair proficiency required in typing. Duties include normal clerical and secretarial service such as correspondence, filing, summaries, graphs, charts and statistical studies. The clerk is normally responsible for daily report preparation. The laboratory clerk usually has time to perform some of the duties of the Junior Analyst.

"ANALYST TRAINEE: High school graduate with some laboratory experience preferred. Keeps equipment clean and does other work in the laboratory as assigned. Must have ability to learn the work required of a junior analyst."

ceived by Jo Ann Barredo and Ann Jones results from the fact that their work requires less skill, effort and/or responsibility than the work of higher paid employees who work under similar conditions." This was nothing more than a special denial of affirmative allegations of the Complaint. In its pre-trial brief, defendant argues that (1) O'Dell possesses greater experience and exercises greater skill than his female co-employees, and he has been delegated greater responsibility; (2) the jobs performed by O'Dell require greater skill than the routine quality control analyses performed by Barredo and Jones; (3) O'Dell has been delegated greater responsibility than the others and it is the scope of responsibility delegated by management, not the actual work performed, which is important.

■■ The burden of proof in this case is upon the Secretary to show that the jobs under consideration require equal work, equal skill, equal effort and equal responsibility and are performed under similar working conditions. The defendant has invoked none of the statutory exceptions permitting payment differentials made pursuant to a seniority system, a merit system, a system which measures earnings by quantity or quality of production or a differential based on any other factor other than sex, which are affirmative defenses the burden of proof of which would be borne by the employer. cf. Mitchell v. Kentucky Finance Co., 359 U.S. 290, 291, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959); Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S. Ct. 453, 4 L.Ed.2d 393 (1960); Craig v. Far Western Engineering Co. (9 CCA 1959), 265 F.2d 251, 72 A.L.R.2d 1143.

■ The Secretary has promulgated comprehensive regulations (29 CFR, Chapter V, Subpart B, §§ 800.100 et seq.) interpreting the equal pay provisions. Such regulations are generally valid and binding, Craig v. Far Western Engi-

neering Co., supra, and our perusal of them persuades us that the Secretary has produced a helpful and reasonable aid to a correct interpretation of the law.

■■ Fundamental in the application of the law is the premise that it establishes an objective standard requiring that a judgment with respect to alleged discrimination between sexes be based upon the requirements of the particular jobs being compared, rather than a comparison of the skill of individual employees, the effort of individual employees, or their previous training and experience.[4] "Application of the equal pay standard is not dependent on job classifications or titles but depends rather on actual job requirements and performance." 29 CFR 800.121. Equal does not mean identical, and insubstantial differences in the skill, effort and responsibility requirements of particular jobs should be ignored (29 CFR 800.-120, 800.122). The job requirements should be viewed as a whole.

■ The preponderance of the evidence clearly shows that the work performed by O'Dell, Barredo and Jones is substantially equal and that their jobs as laboratory analysts require substantially equal skill, effort and responsibility. The only requirement, as we see it, as to which there is room for a reasonable difference of opinion concerns the existence of similar working conditions.

We have no doubt that this defendant may, as it apparently has attempted to do (see Ex. DD, supra), establish a position for a male analyst designated "Shift Analyst", if you will, where the working conditions are different from other analyst jobs, provided the classification is made in good faith and there is no unreasonable discrimination on the basis of sex. The Secretary agrees. "However, in situations where some employees performing work * * * have working conditions substantially differ-

4. Here we do not reach the question of whether O'Dell's past training and experience might have qualified him for higher pay under a "merit system", as

no such affirmative defense was pleaded, and no evidence was tendered in support of such a defense.

ent from those required for the performance of other jobs the equal pay principle would not apply." 29 CFR 800.132. The evidence shows that O'Dell's swing shift work every two weeks is performed under substantially different working conditions; the supervising chemists are absent after 5 p.m., the other analysts are absent after 5 p.m., and part of the work is at night.

The difficulty here is that what the defendant company has done belies any announced intention to differentiate between a day shift and a swing shift analyst on the basis of dissimilar working conditions. The facts are: Between June 11, 1964, the effective date of the Equal Pay Act, and September 1, 1964, O'Dell, Barredo and Jones all worked the day shift, performed the same work and received different wages; since September 1, 1964, O'Dell has worked a swing shift every alternate two-week period and has received an additional five cents per hour for such work; during the alternate two-week periods that O'Dell works the day shift, his job requires substantially the same skill, effort and responsibility as those performed by Barredo and Jones, yet he receives a higher hourly rate of compensation. We think these facts compel the conclusion that the job classification "Swing Analyst" is a paper classification unrelated to the true working conditions, and that the five cent pay differential for swing shift work is intended to compensate for the different working conditions.

Section 800.145 of the Regulations states:

"When applied without distinction to employees of both sexes, shift differentials, incentive payments, production bonuses, performance and longevity raises and the like will not result in equal pay violations. For example, in an establishment where men and women are employed on a job, but only men work on the night shift for which a night shift differential is paid, such a differential would not be prohibited. However, the payment of a higher hourly rate to all men on that job for all hours worked because some of the men may occasionally work nights would result in a prohibited wage differential."

These provisions seem reasonable on their face and as applied to our situation. There could be no effective enforcement of the equal pay provisions if differentials between sexes were permitted for all hours worked because of the substantially different working conditions and responsibilities entailed in a specific part of the work performed at identifiable times and places. As a "Shift Analyst", O'Dell is entitled to a different rate of pay while he is working as a shift analyst, but not while working on the day shift. He and the company apparently have agreed that five cents per hour is a reasonable differential.

The Equal Pay Act of 1963, which, like other Congressional enactments concerning employment practices, was induced by social conditions and working conditions pertaining in metropolitan and industrial areas, presents unique headaches in application to an agrarian-mining-tourist economy such as Nevada's where employers of large numbers of employees are few and far between. Nevertheless, just as the interpretive opinions of the Act by industrially oriented courts in Michigan, New York, Ohio, California and elsewhere will be persuasive authority for us in future cases, so should we interpret the law with deference to the expressed intention of Congress in the light of its nation-wide application. Provincial differences in business practices and customs are not excepted by the law.

Anomolously, the compensation of the two females, Barredo and Jones, will also be equalized by our decree. We see no escape from this result. The last proviso of 29 U.S.C. 206(d) (1) states: "That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee." We cannot adjust O'Dell's wage rate

downward, and inasmuch as Barredo and Jones are doing equal work, must increase the wage rate of both their jobs to equal O'Dell's.

The discretion vested in the employer to establish disparate wage scales on the basis of a seniority system, a merit system or some differential based on a factor other than sex is not transferred to the courts.

The foregoing shall comprise the Court's findings of fact and conclusions of law unless modified on motion. The attorneys for plaintiff shall, within twenty (20) days, submit an appropriate form of decree restraining future violations by defendant of the Equal Pay Act of 1963 and enjoining the withholding of unpaid wages due the female employees since June 11, 1964 to equalize their wage scale to that of O'Dell for day shift work. The approval of attorneys for both parties shall be endorsed thereon with respect to the form of decree and computation of unpaid wages due.