**W. J. USERY, Jr., Secretary of Labor (Successor to John T. Dunlop Resigned), United States Department of Labor, Plaintiff,**

v.

**Horace JOHNSON and Northern School Supply Co., a corporation, Defendant.**

No. A3–75–111.

United States District Court, D. North Dakota, Southeastern Division.

March 31, 1977.

On Injunctive Remedy Aug. 19, 1977.

Harold O. Bullis, U. S. Atty., Fargo, N. D., for plaintiff; William J. Kilberg, Sol. of Labor, U. S. Dept. of Labor, Washington, D. C., T. A. Housh, Jr., Regional Sol., U. S. Dept. of Labor, Kansas City, Mo., Henry C. Mahlman, Associate Regional Sol., U. S. Dept. of Labor, Denver, Colo., of counsel.

Armond G. Erickson, Tenneson, Serkland, Lundberg & Erickson, Ltd., Fargo, N. D., for defendant.

### ORDER

BENSON, Chief Judge.

This action was brought by the Secretary of Labor (Secretary) under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201 et seq., to enjoin alleged wage discrimination on the basis of sex and to recover for female employees of Defendant Northern School Supply Co. (Northern) [1]

---

1. Also named as a defendant was Horace Johnson, manager of the Fargo branch of Northern School Supply Co., a corporation. "Defendant" hereafter shall refer to the Fargo branch of Northern School Supply Co.

the difference between their wages and the wages of two male employees allegedly doing equal work while employed by Defendant.[2] Northern denies the charge and defends any wage variances on the grounds that "differences in compensation [are] due to additional duties and capacities in which the people hired render service." The case was tried to the court, and taken under advisement after the evidence was in.

According to the interrogatories and responses and requests for admissions and responses in the record, all of which were made a part of the evidence at trial, Defendant is an employer within the meaning of the Fair Labor Standards Act, and is engaged in the operation of an enterprise subject to the provisions of the Act. 29 U.S.C. § 203(r), (s)(1). This court's jurisdiction over the present action is conferred by Section 17 of the Fair Labor Standards Act.[3]

The Secretary has alleged specifically the violation of Section 6 of the Fair Labor Standards Act, otherwise known as the Equal Pay Act of 1963 (the Act). Section 6 provides in part:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to

(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee. 29 U.S.C. § 206(d)(1).

In brief, the Secretary charges that the duties of the male and female sales clerks employed by Defendant were essentially the same, and that the female sales clerks have received lower rates of pay than the two males even though the work performed by each of the sales clerks, male and female, was performed with similar skill, effort and responsibility, and under similar working conditions. The Secretary further charges that no other factor other than sex justified the pay differential.

■ At the outset, several established principles with reference to the Equal Pay Act should be noted. In actions alleging wage discrimination under the Equal Pay Act, the burden of proof is on the Secretary to show that the jobs involved are equal within the meaning of the Act. *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974); *Schultz v. American Can Company*, 424 F.2d 356, 360 (8th Cir. 1970). In meeting this burden, the Secretary need not prove that the jobs in question are identical; the test is whether they are substantially equal, *Peltier v. City of Fargo*, 533 F.2d 374, 377 (8th Cir. 1976), requiring the same effort, skill and responsibility, *Schultz v. American Can Company, supra*, 424 F.2d at 360.

---

2. 29 U.S.C. § 206(d)(3) provides:

"For purposes of administration and enforcement, any amounts owing to any employee which have been withheld in violation of this subsection shall be deemed to be unpaid minimum wages or unpaid overtime compensation under this chapter."

29 U.S.C. § 216(c) empowers the Secretary to bring civil actions on behalf of employees to recover such "unpaid minimum wages or the unpaid overtime compensation."

3. Section 17 of the Fair Labor Standards Act, 29 U.S.C. § 217, provides:

The district courts . . . shall have jurisdiction, for cause shown, to restrain violations of section 215 of this title . . . .

Section 215 prohibits the violation of section 206, including the equal wage provision thereof, with which this case is involved.

In making job comparisons under the Equal Pay Act,

> [a]pplication of the equal pay standard is not dependent on job classifications or titles but depends rather on actual job requirements and performance. . . . Job titles are frequently of such a general nature as to provide very little guidance in determining the application of the equal pay standard. 29 C.F.R. 800.121.[4]

See also, *Hodgson v. Miller Brewing Company*, 457 F.2d 221, 227 (7th Cir. 1972); *Hodgson v. Brookhaven General Hospital*, 436 F.2d 719, 724 (5th Cir. 1970).

■ Finally, where the Secretary sustains his burden of proof by demonstrating that the jobs in question are substantially equal, and that differences exist between the pay rates of males and females performing such jobs, the burden of proof then shifts to the employer to show the discrimination is justified under one of the exceptions listed in the Act.[5] *Corning Glass Works v. Brennan, supra*, 417 U.S. at 196, 94 S.Ct. 2223; *Hodgson v. Security National Bank of Sioux City*, 460 F.2d 57, 59 (8th Cir. 1972).

The dispute in this case centers around two principal questions: (1) were differences in the pay rates of the male and female sales clerks at Northern justified by substantially unequal jobs being performed by the males and females; and (2) if the answer to the first question is in the negative, were the male clerks involved in a bona fide training program, a "factor other than sex," which would justify the pay disparities.

4. Regarding the interpretative bulletins promulgated by the Secretary under the Equal Pay Act (29 C.F.R. 800.0 through 800.166), the Eighth Circuit has noted:

> We are mindful that interpretive bulletins of a governmental department charged with the administration of a federal law should be given weight and serve as guidance to the courts. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944); *United States v. American Trucking Associations, Inc.*, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); and as to the regulations under the Equal Pay Act, *Hodgson v. Fairmont Supply Co.*, 454 F.2d 490, 497–498 (4th Cir. 1972); *Schultz v. First Vic-*

## I. WERE THE JOBS SUBSTANTIALLY EQUAL.

■ The evidence at trial established that Defendant's retail store is organized in several sections or departments, among which are arts and crafts, books, stationery, furniture, toys and games. The store is situated in two adjoining buildings, with doorways providing access from one to the other. From the evidence, it appears that the furniture portion of the store is situated in one building, and the other sections or departments are located in the second building.

Much of the testimony at trial concerned the various duties of sales clerks at Northern. Clerks, both male and female, waited on customers, marked prices on goods, stocked shelves, took telephone orders, wrote out charge slips and operated the cash register. In addition, they cleaned and straightened shelves, and, to varying degrees, obtained stock from the warehouse upstairs. Most of the clerks who testified were assigned to work in specific departments at Northern: Duane Emmel worked in stationery and furniture prior to terminating his employment with Northern;[6] Ellen Honek works in books, toys and teaching aids; Margaret Smith worked in all departments at various times; Almae Larson worked primarily in stationery; Paula Johnson worked in books; Marla Anderson worked in stationery and furniture;[7] Linda Overby works in stationery; Jeanette Weenike works in arts and crafts; and Robert Zabell works in stationery and furniture.

> *toria National Bank*, 420 F.2d 648, 653 n. 7 (5th Cir. 1969).
> *Hodgson v. Security National Bank of Sioux City*, 460 F.2d 57, 59 (8th Cir. 1972).

5. The exceptions are set forth in 29 U.S.C. § 206(d)(1), quoted above.

6. Emmel's testimony indicated that 60–70% of his time was spent in stationery, and the remainder in furniture.

7. Marla Anderson testified that one-third or one-fourth of her time was spent in the furniture department.

Defense counsel attempted through various witnesses to emphasize additional duties performed by the male clerks, Emmel and Zabel, in connection with their furniture department responsibilities. Emmel testified that on occasion he would take customers to the warehouse (located above the retail portion of the store) to see a specific item of furniture not on the floor in the retail section. This might necessitate opening up packing cartons and taking the furniture items out of boxes. At times he would help customers carry merchandise which they had purchased to their automobiles. He took his lunch break at a different time than the retail store manager at Northern, Michael McQuillan, who was in charge of the furniture department. Emmel also stated that prior to leaving Northern he became involved in giving discounts in furniture sales; however in response to questions posed by Plaintiff's counsel, Emmel stated that discount boundaries were set by McQuillan. Emmel also apparently set up and arranged furniture displays in the furniture section of the retail store.

Robert Zabell testified that he currently spends about fifty per cent of his time in the furniture department. Zabell's testimony, as well as that of McQuillan, indicated that Zabell's functions in the furniture department were substantially the same as Emmel's.

Based on all the testimony adduced at trial, as well as evidence contained in the interrogatories and responses and requests for admissions and responses introduced in evidence at trial, this court has determined that the jobs of those female clerks about whom testimony was adduced and the jobs of the two male clerks in question were substantially equal, and that the male clerks were paid at a rate higher than female clerks at Northern for "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions    . . . ."    29    U.S.C. § 206(d)(1).

First of all, the skill required of each of the clerks in the selling of merchandise was substantially the same whether the goods sold were furniture items or items from any other department at Northern. According to the Interpretive Bulletin for the Equal Pay Act,

> [s]kill includes consideration of such factors as experience, training, education, and ability. It must be measured in terms of the performance requirements of the job. 29 C.F.R. 800.125.

Defendant has not claimed that experience was a factor upon which the pay disparities between male and female clerks were based. Many of the female clerks had much more experience in sales clerk duties than did either of the two males at the time the males were hired,[8] and even among the female clerks, experience appeared to play a very minor role in determining wage rates.[9] Training or education likewise played no part in the setting of wages. None of the clerks completed any type of training program prior to employment with Northern. With respect to education, although not all the female clerks at Northern had college degrees, those who did were not paid at the same rate as the male clerks, both of whom had college degrees.[10] Finally, there is scant evidence in the record to indicate that ability—presumably the ability to sell merchandise—played any significant part in the setting of sales clerks' wages at Northern, either at the time of

---

8. At the time of hiring neither Emmel nor Zabell had prior sales experience, although Zabell had taught distributive education for a year.

9. For example, in May of 1974, Margaret Smith, who had over three years clerking experience at the time, was paid $2.00 per hour, whereas Almae Larson, with less than one year's experience, received $2.00 per hour also.

10. A college education was not a requirement for a sales clerk position at Northern. The degrees which some of the clerks had were in such diverse fields as speech pathology and physical education (the major and minor, respectively, of Marla Anderson), history and coaching (the major and minor of Emmel), sociology (Paula Johnson), and education (Zabell).

hiring [11] or later on during the course of employment.

There was, though, testimony at trial that the selling of furniture, a duty performed by both male clerks part of the time, required certain abilities not required in the selling of other items at Northern, such as stationery items or goods from the arts and crafts department. However, the fact that a janitor at Northern, one Bruce Arnold, assembled and sold furniture between the time Emmel left and Zabell was hired (a period of approximately 15 months), as well as the fact that certain female clerks were involved in selling furniture items,[12] indicates that whatever additional abilities were required in selling furniture were unsubstantial and incidental to performance of the primary functions of all the sales clerks.

In sum, the skills necessary to adequately perform the duties of a sales clerk at Northern, in terms of the performance requirements of the job, did not vary substantially from one department to another.

The effort requirements of the various clerk positions at Northern were also substantially equal. With respect to physical effort, evidence in the record indicates that both male clerks were sometimes involved in carrying and moving items into the furniture department at Northern, along with Michael McQuillan (retail store manager), warehouse workers and Bruce Arnold, the janitor referred to above. The time consumed in moving and carrying these items by the male clerks was insignificant,[13] and there was no indication that they were required to physically lift heavy furniture items and carry them down flights of stairs from the warehouse to the furniture department.[14] In addition, several of the female clerks stated that they too went up to the warehouse to obtain supplies on occasion, although most of the items carried by the female clerks were lighter than many furniture items.[15]

With respect to mental effort, there was testimony at trial, principally from Michael McQuillan, retail store manager, and Zabell, that the sales effort required in selling furniture items (a function performed part of the time by both male clerks) was greater than that required in selling other items. Specifically, McQuillan stated that clerks in the furniture department at times went through catalogs with customers to show them different furniture items; they had to "know the product" they were selling (for example, the gauge of metal in a metal desk, whether a wooden furniture item was screwed or glued together, etc.); they sometimes took customers up to the warehouse to see furniture items not on the floor; and they sometimes gave "discounts" in furniture sales.

Two points should be noted with reference to the "mental effort" testimony relating to furniture sales. First of all, even assuming that greater mental effort was required in the selling of furniture items, there is no indication that either Emmel or Zabell had, at the time each was hired and his starting wage determined, knowledge of the furniture catalogs or knowledge "of the product" such that at the time of hiring each could exert this required mental effort in selling furniture to customers.[16] Second-

---

11. At the time of hiring, whatever "ability" either of the males had with reference to selling merchandise at Northern was clearly an unknown.

12. Female clerks received no additional compensation for selling furniture items.

13. Emmel testified that 5–10% of his time (2–4 hours per week) was spent performing this duty.

14. Wheeled vehicles, sometimes referred to as "hand trucks," as well as the elevator at Northern were utilized in moving furniture items.

15. Female clerks occasionally used wheeled vehicles to carry down from the warehouse supplies needed in their departments.

16. As noted previously, neither Emmel nor Zabell had sales experience, in furniture or anything else, prior to employment at Northern. Jeanette Weenike, one of the female clerks, did have experience selling furniture prior to her employment at Northern, although she has been assigned work in arts and crafts while at Northern.

ly, as noted above, the fact that Bruce Arnold, a janitor at Northern, was able to fill in in the furniture department after Emmel left and before Zabell was hired, and the fact that both Almae Larson and Marla Anderson (female clerks) sold furniture at Northern, indicate that whatever additional mental effort was required to sell furniture as opposed to other items at Northern was slight or inconsequential.

Responsibility, another criterion considered under the Equal Pay Act, did not vary substantially from one department to another. Basically, each clerk was responsible to make sure that customers were waited on and were satisfied with the service they received, that sufficient stock was available in his or her department, that items of merchandise were properly marked, that sales were figured correctly and that correct change was given.

At trial Defendant attempted to demonstrate through various witnesses that the selling of furniture by the male clerks involved greater responsibility than the selling of other items at Northern. However, the discussion above relating to the furniture department duties of Bruce Arnold as well as certain of the female clerks is just as relevant when considering "responsibility" under the Equal Pay Act; any difference in responsibility in selling furniture as opposed to other items was unsubstantial.[17]

There was no evidence indicating a difference in working conditions which would justify the wage rate disparities between male and female sales clerks. All clerks apparently worked the same hours (although days off varied), and although the furniture department was situated in a building adjoining that containing other departments, no showing was made at trial that this factor amounted to a significant difference in working conditions.[18]

The Secretary having clearly established the equality of sales clerk positions at Northern about which testimony was adduced at trial in terms of skill, effort, responsibility and working conditions, inquiry must now be made into whether the discrimination in wages between male and female sales clerks was valid under one of the exceptions to the Equal Pay Act.[19]

## TRAINING PROGRAM

■ The only evidence at trial pertaining to an exception to the Equal Pay Act dealt with a "training program."[20] Defense counsel attempted to demonstrate, principally through the present manager of the Fargo branch of Northern School Supply Co., and its past president and general manager, the existence of a training program designed to train outside salesmen or store managers. This "program," it is asserted, was the basis for wage disparities between male and female sales clerks at Northern, and thus was a "factor other than sex" under the Equal Pay Act.

Under the Interpretive Bulletin[21] and various decisions construing 29 U.S.C. § 206(d)(1), a bona fide training program in which persons being paid a higher wage are involved is a valid exception to the Equal Pay Act. Although the "training program" exception to the Equal Pay Act is not specifically defined in either the Act or the Secretary's Interpretive Bulletin, the lack of a rigid definition is consistent with the underlying purpose of the Equal Pay Act— to insure equal pay for equal work, *Schultz v. First Victoria National Bank*, 420 F.2d 648, 657 (5th Cir. 1969)—in allowing courts to view the facts of each particular case to determine the bona fides of training pro-

17. *See* 29 C.F.R. 800.129, 800.130.

18. *See* 29 C.F.R. 800.131, 800.132.

19. 29 U.S.C. § 206(d)(1), quoted in full above, contains a list of the exceptions to the Equal Pay Act.

20. There was no evidence that wage rates were set under (1) a seniority system, (2) a merit system, or (3) a system which measured earn-

ings (wages) by quantity or quality of production. A valid "training program" under which an employer discriminates in wages falls under the fourth exception to the Act—"a [wage] differential based on any other factor other than sex."

21. *See* 29 C.F.R. 800.148.

grams and whether or not they qualify under the "factor other than sex" exception to the Act.

Courts involved in litigation concerning alleged training programs have developed certain indicia which in particular cases may establish the existence of a bona fide training program. A program available to both female and male employees is one indication of a bona fide program. If trainees are informed upon being hired that they are entering a training program, this too would indicate the existence of a bona fide program. Other factors might include the fact that the training program is set forth in writing, and that trainees are rotated through the various departments of the establishment. *See Hodgson v. Security National Bank of Sioux City, supra* ; *Hodgson v. Behrens Drug Company*, 475 F.2d 1041 (5th Cir. 1973); *Schultz v. First Victoria National Bank, supra.*

In the present case, there was no clear evidence that Defendant's "training program" was open to females as well as males. In addition, although Zabell testified that he was hired as a "trainee," Emmel, the first of the two male clerks hired at Northern, was apparently unaware of his involvement in a "training program." Finally, there was no evidence of any written training program setting forth a job description for "trainees," nor was there any evidence that the program for Emmel and Zabell specifically included training in each of Northern's departments. In short, Northern's "training program" had no substance and significance independent of the "trainee's" regular job. *Hodgson v. Behrens Drug Company, supra*, 475 F.2d at 1048. It was

> not specific and [its] metes and bounds were at best poorly surveyed. As structured and operated it was little more than a post-event justification for disparate pay to men and women from the commencement of employment. . . .
> The training was essentially the acquir-

ing of skills, and experience and knowledge of the business through continued performance of regular tasks. In this sense every job in every type of business would be training, and nothing would be left for the operation of the Interpretative Bulletin Training program. . . . *Schultz v. First Victoria National Bank, supra*, 420 F.2d at 655–56 (footnote omitted).[22]

In summary, the Court finds that the jobs of Duane Emmel, Agnes Baker, Doris Bower, Ellen Honek, Margaret Smith, Jeanette Weenike, Almae Larson, Paula Johnson, Rebecca Johnson, Kathryn Luther, Mary Ann Kinane, Rea Maattala, Robert Zabell, Linda Overby, Marla Anderson, Sandra Tenpas, Sara Lindberg, Marilyn Brucker, Laurie Lerfald and Rebecca Ames are substantially equal.

The Secretary has established a prima facie case of wage discrimination under the Equal Pay Act, and since Defendant has failed to show that the discrimination in wages is based upon any factor other than sex, the Secretary is entitled to an appropriate judgment.

Counsel for both parties, Plaintiff and Defendant, are ORDERED to prepare and submit written briefs on the issue of what remedy is appropriate under the facts of this case. The briefs shall be filed not later than thirty (30) days from entry of this order.

### MEMORANDUM OPINION

### ON INJUNCTIVE REMEDY

The Court's Order of March 31, 1977, directed counsel for both parties, Plaintiff and Defendant, to submit briefs on the appropriate remedy under the facts of this case. Memoranda and supplemental memoranda have been filed with respect to injunctive remedy (1) restraining the withholding of back wages found due under the Equal Pay Act, and (2) prospectively restraining Defendant from violating provisions of the Act; the matter is now at issue.

---

22. There was no evidence of when the "training program" at Northern was instituted, how long the "program" lasted, or what factors were considered in determining who was to enter the "training program."

### I. *Back Wages Due.*

Assuming there has in fact been a violation but reserving to the Defendant the right of appeal on the issue, the parties are not in dispute with respect to the following:

(1) A back pay order should issue once a violation of the Equal Pay Act has been determined;

(2) Interest on the amounts withheld is to be assessed against Defendant.

They disagree, however, with respect to:

(1) Computation of back wages due; *i. e.*, the amount due each affected employee;

(2) Whether the two or three year statute of limitations (29 U.S.C. § 255) applies herein.

### A. *Formula for computing back wages due.*

■ Congress did not include, within the Equal Pay Act, a provision governing the computation of back pay awards in cases where an employer is found to have discriminated between employees on the basis of sex in violation of the Act. Thus, the fashioning of an appropriate remedy is left to the courts. *Brennan v. City Stores, Inc.,* 479 F.2d 235, 242 (5th Cir.); *rehearing en banc denied,* 481 F.2d 1403 (5th Cir. 1973). Prior decisions in cases involving Equal Pay Act violations provide some guidance on the issue.

The basic premise of the Act is quite simple: equal pay for equal work. *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974) (*citing* S.Rep. No. 176, 88th Cong., 1st Sess., 1 (1963). "Equal work" under the Act is defined in terms of "jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions . . . ." 29 U.S.C. § 206(d)(1). The appropriate back pay remedy, based on the purpose of the Act and its definition of equal work, would appear to be an award which would equalize the wage rates of female employees with that of male employees doing the "equal work."

A few courts, in fashioning back pay awards under the Act, have established rates for female employees based on those of male employees with "comparable seniority or longevity." *Hodgson v. City Stores, Inc.,* 332 F.Supp. 942 (M.D.Ala.1971), *aff'd sub nom, Brennan v. City Stores, Inc., supra; Hodgson v. Schnuck,* 333 F.Supp. 798 (E.D.Mo.1971). Other courts have required the defendant to raise the wage rate of females to equal that which males formerly received, or were awarded, apparently without regard to established wage patterns. *Schultz v. Saxonburg Ceramics, Inc.,* 314 F.Supp. 1139 (W.D.Pa.1970); *Wirtz v. Basic, Incorporated,* 256 F.Supp. 786 (D.Nev.1966). *See also, Hodgson v. Industrial Bank of Savannah,* 347 F.Supp. 63 (S.D.Ga.1972); *Wirtz v. Meade Mfg., Inc.,* 285 F.Supp. 812 (D.Kan.1968). For reasons which will be set forth, this court holds that, under the facts of this case, the second approach set out above is appropriate, and the computation of back pay awards herein will be without regard to seniority or longevity.

First, in the case at bar, the violation in question involves only two males, each with no experience in the business, hired at a starting rate of $2.50 per hour. Any back pay award which used seniority or longevity as a touchstone would result in (1) those females with limited experience who were hired at about the same time as the first male, October 22, 1973, being paid at the $2.50 per hour rate, and (2) those females with experience who had been employed by Defendant prior to the hiring of the first male being paid at a rate *higher* than $2.50 per hour. It would be unreasonable to suggest that, upon hiring the first male on October 22, 1973, at $2.50 per hour, Defendant was required to raise the wage rates of all its then employed female sales clerks above the $2.50 rate; it is just as unreasonable to suggest that in awarding back wages herein, the court's order should have the same effect. There is no indication that Congress intended such a result when it enacted into law the Equal Pay Act of 1964.

The second and perhaps more important reason why seniority or longevity will not

be considered in determining Defendant's back pay liability herein is that Defendant, in the operation of its business, including the hiring and paying of its employees, has a right to establish its own policies and wage scales with reference to seniority, longevity, or any other differential based on a factor other than sex. In this respect the court agrees with the United States District Court for the District of Nevada:

> "The discretion vested in the employer to establish disparate wage scales on the basis of a seniority system, a merit system or some differential based on a factor other than sex is not transferred to the courts." *Wirtz v. Basic, Incorporated, supra.* 256 F.Supp. at 792.

Back pay awards are therefore to be computed as follows:

(a) For those female sales clerks employed by Defendant prior to the hiring of the first male clerk, Duane Emmel—each of their respective pay rates is increased as of 10–22–73 to the $2.50 per hour rate which Emmel was paid. Individual awards are to be determined by deducting the wage rate of each from the $2.50 rate, multiplied by the number of hours worked. Overtime pay is to be based on 1½ times the individual pay differentials.[1]

(b) For those female sales clerks employed by Defendant after Emmel was hired—each of their respective pay rates is increased from the date hired to $2.50 per hour.[2]

Those entitled to back pay awards are also due simple interest at the rate of 6% per annum, *Hodgson v. Daisy Mfg. Co.,* 445 F.2d 823 (8th Cir. 1971); *Hodgson v. American Can Co.,* 440 F.2d 916 (8th Cir. 1971), computed "from the dates of the underpayment" to the date payment is tendered. *Id.* at 922. The parties herein agree that interest on amounts owing employees of Northern can, for the sake of simplicity, be computed on the basis of mid-points of the time periods for which back wages are due each individual. For those female clerks already employed at the time Emmel was hired (putting aside any question of 29 U.S.C. § 255's limitation, which is dealt with *infra*), time periods would begin to run on the date 10–22–73, and end as of the date each either terminated employment at Northern or began receiving wages at a rate which complies with this court's holding.[3] For those female clerks hired subse-

---

1. The following will be awarded back pay under this formula: Agnes Baker, Doris Bower, Ellen Honek, Margaret A. Smith, Jeanette Weenike and Almae Larson. In the memoranda filed in response to this court's order of March 31, 1977, both parties list Lucille Mattison as a female sales clerk entitled to an award under this computation. Because (1) reference to Lucille Mattison in the record, scant at best, indicates that she was (and apparently still is) a part-time employee, and (2) no evidence was presented at trial with respect to Lucille Mattison's duties at Northern School Supply, she is not entitled to a back pay award.

Almae Larson, while omitted from this group in both Plaintiff's and Defendant's memoranda, is entitled to an award under this formula. Her testimony at trial, as well as the answers to interrogatories admitted into evidence at trial, indicate that she was hired in September of 1973, prior to the time Emmel was hired. She is thus entitled to the $2.50 rate as of 10–22–73.

2. Those female sales clerks in this group are: Paula Johnson, Rebecca Johnson, Kathryn Luther, Mary Ann Kinane, Linda Overby, Marla Anderson, Rea Maattala, Sandra Tenpas, Sara Lindberg, Marilyn Brucker, Laurie Lerfald and Rebecca Ames.

In the memoranda filed in response to this court's order, the parties agree that Nadir Billimoria and Joan H. Johnson, two female sales clerks hired by Defendant during 1976, subsequent to the time of Defendant's submission of answers to interrogatories but prior to trial, should also be awarded back pay from the date of hiring based on the $2.50 scale. Since both parties apparently are of the opinion that the sales clerk duties of these two clerks are substantially the same as those of other sales clerks at Northern involved herein, back pay awards to these two employees are appropriate.

The memoranda also indicate that all other sales clerks hired since submission of Defendant's answers to interrogatories were paid a beginning wage of at least $2.50 per hour. These clerks are not entitled to back pay awards.

3. The mid-point computations for Agnes Baker, Doris Bower, Ellen Honek, Margaret A. Smith, Jeanette Weenike and Almae Larson (again, putting aside for the present 29 U.S.C. § 255's possible limitation) would involve periods be-

quent to Emmel, the time periods commence at date of hiring and end as of the date each either terminated employment at Northern or began receiving wages at a rate which is in compliance.

### B. *29 U.S.C. § 255*

■ The court finds the equal pay violation in this case was not "willful" and therefore the two year statute of limitations provided in 29 U.S.C. § 255 is applicable.[4]

Although the courts are not in agreement as to what constitutes a "willful" violation of the Fair Labor Standards Act, of which the Equal Pay Act is a part, the correct standard seems to be that set forth in *Boll v. Federal Reserve Bank of St. Louis*, 365 F.Supp. 637 (E.D.Mo.1973), aff'd 497 F.2d 335 (8th Cir. 1974).

> Since the Portal-to-Portal Act limitations apply to civil actions, the term "willful" which was added by the 1966 amendment must be construed in the civil sense. It therefore applies to violations which are intentional, knowing or voluntary as distinguished from accidental and it is used to characterize conduct marked by careless disregard whether or not one has the right so to act.

365 F.Supp. at 648–49, *quoting Hodgson v. Hyatt*, 318 F.Supp. 390, 392–93 (N.D.Fla. 1970).[5]

Defendants conduct herein, when viewed under this standard, cannot be characterized as "willful;" the normal two-year limations period applies to its liability for back pay awards. Back pay liability extends back only to December 22, 1973, two years prior to the commencement of this action.

### II. *Injunction Restraining Future Violations.*

■ Once a violation of the Fair Labor Standards Act is found to exist, in addition to other remedies provided by statute, the court, as a court of equity, also has the power to enter an order restraining future violations of the Act. 29 U.S.C. § 217. The granting of such an injunction is left to the sound discretion of the trial court. *Hodgson v. American Can Co., supra*, 440 F.2d at 920. An injunction under § 217 is "remedial in nature; i. e., intended to prevent future violations; it is not imposed as punishment for past violations." *Brennan v. Correa*, 513 F.2d 161, 163 (8th Cir. 1975); *accord, Mitchell v. Southwest Engineering Co.*, 271 F.2d 427, 432 (8th Cir. 1959).

In the present action, Defendant has modified its wage policies to conform to the Equal Pay Act, and there is no evidence that Defendant has any intent other than to comply with its provisions in the future. Furthermore, the testimony at trial showed that Defendant proceeded in good faith in paying Emmel the higher wage when he came to work at Northern. For these reasons, and also because "the facts relating to the similarity of duties performed by male and female [clerks] presented a question not entirely free of controversy," *Hodgson v.*

---

ginning 10–22–73 and ending with the date each terminated employment at Northern or, in the case of Ellen Honek, until her wage rate was or is raised in accordance with this memorandum opinion.

**4.** A three year statute of limitations is applicable to willful violations.

**5.** In her memorandum, counsel for Plaintiff urges this court to follow the Fifth Circuit's extremely broad definition of "willful" as that term is used in 29 U.S.C. § 255:

> An employer acts willfully and subjects himself to the three year liability provision if he knows, or has reason to know, that his conduct is *governed by* the Fair Labor Standards Act.

*Brennan v. Heard*, 491 F.2d 1, 3 (5th Cir. 1974) (emphasis in original).

In the case at bar, Defendant, after years, apparently, of hiring female sales clerks, hired a male in 1973. It was this hiring that initially entangled Defendant in the present lawsuit. To hold that knowledge on the part of Defendant that the Fair Labor Standards Act *governed* its conduct (minimum wage provisions, child labor provisions, etc.) necessarily means Defendant acted "willfully" in violating the Equal Pay Act would be harsh, and would seem to go beyond what Congress had in mind when it added the "willful" provision to 29 U.S.C. § 255 in 1966.

*American Can Co., supra,* 440 F.2d at 920, an injunction will not issue restraining future violations of the Act.

### *Order for Judgment*

Counsel for the parties will confer for the purpose of determining the amount of back pay to be awarded to those employees of Defendant held to be entitled to back pay, and submit a proposed judgment to the court, without prejudice to the right of the parties to appeal from that judgment. Plaintiff will recover its costs.