Ray **MARSHALL,** Secretary of Labor, United States Department of Labor, Plaintiff,

v.

**GERWILL, INC.,** doing business as Local Cab Co., and Willard Durbin, Individually and as an Officer thereof, Defendant.

Civ. A. No. J–78–1329.

United States District Court, D. Maryland.

Aug. 13, 1980.

Carin A. Clauss, Sol. of Labor, Washington, D. C., Marshall H. Harris, Regional Sol., Joan M. Roller, U. S. Dept. of Labor, Philadelphia, Pa., Russell T. Baker, Jr., U. S. Atty., Ellen L. Hollander, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

John Wheeler Glenn, O'Connor, Preston, Glenn & Smith, P. A., Baltimore, Md., for defendant.

## MEMORANDUM AND ORDER

SHIRLEY B. JONES, District Judge.

Plaintiff, the Secretary of Labor, United States Department of Labor, brought this action against the defendants seeking monetary and injunctive relief for various violations of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201–219 (FLSA). Plaintiff essentially contends that:

(1) the defendants failed to pay certain employees (taxicab drivers) minimum

wages for all the hours worked, 29 U.S.C. § 206, and for work performed which was an integral part of their job, 29 U.S.C. § 254;

(2) the defendants were required to pay their dispatchers and helpers overtime for any work performed over forty hours per week;

(3) that the defendant Durbin is an employer within the meaning of the FLSA and should be held jointly and severally liable with Gerwill, Inc.;

(4) that the defendants' violations were willful within the meaning of the FLSA and thus the three year (and not two year) statute of limitations period is applicable;

(5) that the defendants should be enjoined from further violations of the FLSA; and

(6) that the plaintiff is entitled to prejudgment interest on the back wages due.

This action has its beginnings in Hagerstown, Maryland in May of 1975. At that time Willard Durbin, who owned a towing service in Hagerstown (Durbin Auto Service) became interested in the operation of Local Leasing Corporation (Local Leasing). Local Leasing operated a taxicab service in Hagerstown. While a contract was entered into on May 27, 1975 (defendants' Exhibit 1) between Local Leasing and Gerwill, Inc. (Gerwill), Durbin acted as a caretaker of the business until early September of that year when Gerwill (which continued to do business as Local Leasing) took over as owner.[1] As will become relevant later, Durbin met with Wayne Baumgardner, a Department of Labor Compliance Officer (among others), in May of 1975 concerning certain problems Local Leasing had with the Internal Revenue Service (payment of liens) and in not complying with the FLSA. Durbin met Baumgardner sometime later on the street in Hagerstown and, according to Baumgardner's testimony at trial, told

Baumgardner that he knew he was not in compliance with the FLSA. He further indicated that if the Maryland Public Service Commission approved his requested rate increase, he could then pay minimum wages to his drivers and that he would retroactively pay "make-up pay" for those drivers who had not earned minimum wages. After no improvements were forthcoming, Baumgardner began an investigation of the company's records in December of 1977 and concluded in February of 1978. This investigation included speaking with drivers and company officials, chiefly Karl Snyder, Gerwill's bookkeeper, and examining manifest sheets, "yellow tags" (see *infra* at 748–749), some invoices and work records of drivers, gas attendants and dispatchers. Subsequent to that investigation, Baumgardner met with Snyder and Frances Showe[2] at what he termed a "closing conference." Baumgardner informed them of the alleged violations of the FLSA, of future compliance measures and sought, but did not explicitly receive, any assurances. Baumgardner returned to Gerwill in June of 1978, prior to the sale to Turner Taxi, and examined sample manifest sheets. He testified that there were no changes at all for any class of employment at Gerwill (drivers, dispatchers or gas attendants). Suit was filed on July 20, 1978.

The facts in this case are relatively simple. It is the legal implications from those facts and the plaintiff's methodology in computing damages for both the alleged minimum wage violation and uncompensated time violation that cause the Court some disconcertion. Accordingly, after setting forth the general factual scenario, the Court will expound on the facts relevant to the respective legal issues and will deal with these issues *seriatim*.

Parenthetically, at the beginning of the trial, the parties stipulated that certain

---

1. It has never been controverted by the defendants that Willard Durbin at all times has served as president of Gerwill and that the stock of the corporation is owned by Durbin and his wife, Geraldine.

2. Ms. Showe was employed at that time, and presently, for Durbin Auto Service. She also worked part time at Gerwill as the Officer Manager from March or April of 1976 until Gerwill sold the taxicab business to Turner Taxi in June of 1978. (Defendants' Exhibit 5).

non-driver employees (dispatchers and gas attendants) were owed overtime back wages. The defendants stipulated that while these fourteen employees were owed $4,097.87 in overtime, it was not part of the stipulation that this amount included, as requested by plaintiff, pre-judgment interest, or that the failure to pay this money was willful. With these provisos, the stipulation was accepted by the Court. The issues of pre-judgment interest and willfulness shall be dealt with later (*infra* at 755–756).

Numerous drivers and dispatchers testified on behalf of the plaintiff. Robert E. Sprankle, Sr., for example, testified that he was a driver and dispatcher for Gerwill and had worked for Local Leasing. Sprankle testified that both prior and subsequent to moving to the new office behind the Maryland National Bank Building (201 W. Franklin Street) in September of 1975, it was the driver's responsibility to clean out the cab prior to beginning work and sometimes (after the move) to gas up the cab. At that point, whether the driver's manifest sheet had already been punched in or not, the driver was still not on the day's payroll until he reported to the dispatcher that he was ready to go. During the day, if Sprankle wished to take lunch or to "grab a cup of coffee at the Snow White" (a restaurant near a popular taxistand in Hagerstown that the drivers apparently frequented), he reported this to the dispatcher. Most of the drivers who testified followed the same pattern. It is what the dispatcher upon receiving the information did (*i.e.*, punch the driver off the clock) that is controverted and is an important factor in both the back wages and full compensation issues.[3] Upon re-entering his cab, the driver reported to the dispatcher that he had returned and at that point (according to plaintiff) the driver was back on the clock. After Sprankle had discharged his last passenger, he radioed the dispatcher that he was returning to the office. The credible testimony is that at that point the dispatcher punched a yellow ticket and the driver was off the clock. According to Sprankle and all the drivers, it generally took between 5 and 8 minutes to get back to the office, regardless of where in Hagerstown they were. While some of the drivers' testimony varied, Sprankle testified that it then took 15–20 minutes "if lucky" to punch in the manifest sheet and hand it to either Mr. Snyder or Ms. Showe. Sprankle, under cross-examination, testified that he always called the dispatcher when he took a break but that he realized some drivers did take breaks without reporting them.[4] While there is no exact figure, Sprankle testified that he had from time to time engaged in "knock-downs," *i.e.*, drivers not reporting their entire fares for a shift. All but one of the drivers testified that he had knocked-down, and the issue of knock-downs is at the very foundation of the defendants' case. Defendants argue that since all fares should have been reported and were not, no violations of the minimum wage provisions of the FLSA can exist.

The rest of the drivers testified essentially of the same general procedures as set forth by Sprankle. They also testified that they knocked-down and also did not report tips. For example, Jack Leggett (driver) testified that he could not remember if he reported to Mr. Snyder the approximately $20 per month in tips he received, and he certainly did not report the $3 per day in knock-down money. Howard W. Hornbaker (driver) did not report $20 per month in tips or $6–8 per week in knock-down money. The other drivers generally testified to a like amount of knock-down money, the

---

**3.** As hereinafter specified, plaintiff claims that certain activities by the drivers prior to picking up passengers and subsequent to dropping off their last passenger and returning to the office are an integral part of their job for which they deserved to be compensated. Defendants contend that, on the facts of this case, the amount of time the plaintiff contends is owed to the driver (20 minutes per day) is exaggerated. If indeed any time was spent, it was "preliminary to or postliminary to said principal activity or activities." 29 U.S.C. § 254(a)(2).

**4.** Not all rest periods should be uncompensated. See 29 C.F.R. § 785.18 (1979) (rest periods of short duration) and § 785.19(a) (bona fide meal periods).

highest being Eugene Imes' testimony of $20–22 per week. The relevance of unreported tips and knock-down money will be explicated when dealing with the allegations of minimum wage violations.

Donnie Light, a dispatcher for Local Leasing and later for Gerwill, testified as to the physical layout of both the old and new offices. As relevant herein, Light testified that the driver was punched in when he went out on the street, not when he got his first haul. Light also testified that if a reported break was for more than five minutes, he punched a yellow ticket on the driver indicating that the driver was off the clock.

Finally, most of the other drivers who were witnesses testified that there was some delay in the check out process, i. e., from the time they arrived at the office at the end of their shift to being ready to leave the premises. The times were generally between 5 and 10 minutes, except for Sprankle's estimated 15 to 20 minutes.

As mentioned earlier, (*supra* at 746–747), Wayne Baumgardner conducted the investigation for the plaintiff. From the records of the defendants and from the conversations with Snyder, Baumgardner estimated that there was a 30–45 minute difference between when the manifest was punched on the dispatcher's desk when the driver arrived in the morning, and when the first yellow ticket was punched indicating the first fare. The time on that yellow ticket was, according to Baumgardner, the driver's starting time. Likewise, the driver's quitting time was the time on the last yellow ticket which was punched when the driver reported to the dispatcher that his last fare was finished and that he was heading back to the office.[5]

The defendants' case can be quickly capsulized. First, Durbin claims that he had no control over the running of Gerwill and no personal involvement with the hiring, firing, and paying of employees except in isolated and exceptional circumstances. This, he claims, negates any "willful" violation of the FLSA on his part and thus makes the three years statute of limitations under 29 U.S.C. § 255(a) inapplicable. Second, defendants assert that "but for" the prevalent practices of the drivers in failing to report tips and engaging in knock-downs, a larger purse at the end of each driver's shift would have accrued. A larger purse would have resulted in a larger gross amount of commission wages (40% for day drivers, 50% for nighttime drivers). The larger amount divided by the number of hours worked would have equaled the minimum wage for that respective year.[6] Defendants likewise argue as to the knock-down money that the plaintiff, who on behalf of these very same drivers[5] seeks to collect money for alleged minimum wage violations and payment for uncompensated time, should not be allowed to reap an award for their dishonesty. Finally, defendants contend that the alleged uncompensated activities were not an integral function in driving their cabs but were rather preliminary or postliminary to their job, and thus time that need not be compensated.

*Minimum Wage Violations*

Plaintiff contends that on the face of the employer's records, it can be readily seen that the employer has not paid the applicable minimum wages. Herein lies the relevancy of the yellow tickets. Concomitantly tied to this is the issue of preliminary or postliminary activities, of which the plaintiff claims 20 minutes is a fair and reasonable amount due the drivers per day. The

---

**5.** Baumgardner's two-fold method of computation with the added 20 minutes for the alleged uncompensated time and from the defendants' records, shall be discussed in the relevant sections.

**6.** The applicable minimum wages were: $2.00 in 1975; $2.20 in 1976; $2.30 in 1977; and $2.65 in 1978.

credible evidence, from the drivers, dispatchers, Mr. Snyder, Ms. Showe and Mr. Baumgardner is that the yellow tickets were the key in compiling a driver's total hours at the end of his shift. Plaintiff's Exhibits 1 through 5 are examples of manifest sheets for five employees for a week, the weeks being at different times during the investigation. The manifest sheets as expounded upon in the testimony of Mr. Baumgardner show numerous examples of a yellow ticket taking a driver off the clock, and a yellow ticket bringing the driver back on the clock. More relevant, there is a time differential between the punching of the manifest (when the driver first enters the office at the beginning of his shift) and the punching of the yellow sheet. For example, Albert Bartlett's manifest sheet for August 23, 1976, was punched in at 7:33 a. m. The first yellow ticket was punched at 7:38 a. m. (Plaintiff's Exhibit 1). Harry Fink's manifest sheet for June 5, 1978 was punched in at 4:48 a. m. while the first yellow ticket was punched in at 5:04 a. m. While the ultimate legal relevance turns on whether this time was spent as an integral part or preliminary to the employee's main activity, it is certainly relevant at this point to indicate defendants' payroll computation.

■ Plaintiff argues that even without a credit of 20 minutes per day per driver as uncompensated time, defendants have failed to pay minimum wages from the face of their records. This latter method of computation need not be examined. In the Court's judgment, the credible evidence is that there was time spent by the drivers prior to getting out on the street in their cabs, and subsequent to discharging their last passenger that was not compensated by the defendants. While there was some testimony from Light that the drivers were not punched out until they radioed the dispatcher that they were going out on the streets because some drivers tended to "mess around" after the manifest sheet was

punched in, the credible evidence is that there was some time spent by the drivers in getting to the cabs from the office, sometimes gassing up the cab and cleaning it out. If this were the only example of uncompensated time, the Court would be inclined to invoke the de minimis rule (*infra* at 751), as set forth in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692, 66 S.Ct. 1187, 1194, 90 L.Ed. 1515 (1946) and *E. I. DuPont DeNemours & Co. v. Harrup*, 227 F.2d 133, 136 (4th Cir. 1955). However, Baumgardner's testimony and plaintiff's Exhibits 1 through 5 readily show that yellow tickets were punched out for breaks and that a yellow ticket was punched when the driver radioed the dispatcher that he was returning to the office. The amount of time it took to return to the office, park the cab, take the manifest sheet and purse up to the office (and sometimes wait in line to do the last activity) cannot be said to be postliminary to the main activity of the driver.

■ Plaintiff's Exhibit 6 is the payroll sheets of the defendants of all employees during the investigation period. Baumgardner testified that to the total hours of an employee driver, he credited 20 minutes per day of uncompensated time. He rounded the hours to the nearest quarter hour. For example, with the adjusted time added, Jack Leggett worked 1,068.5 hours in the calendar year 1975. These hours, times $2 an hour as the applicable minimum wage, equals $2,137 due Leggett. Taking this latter figure and subtracting the $1,667.36 figure actually paid, leaves $469.64 due Leggett for that year (A–77, plaintiff's Exhibit 6). Using this same methodology, even though the hours worked and minimum wage were different, Leggett was owed $743.05 for 1976 (A–77a) and $184.35 for 1977 (A–77b) thus totaling $1,367.04. While these and other figures may be mathematically suspect,[7] the methodology utilized by the plaintiff appears fair and reasonable.

---

7. The following figures $469.64 + 743.05 + 184.35 add up to $1,397.04 and not, as calculated by the plaintiff $1,367.04. This miscalculation, as well as others pointed to in the cross-examination of Baumgardner, warrant sending this case back to the plaintiff for recomputation of all figures itemized in plaintiff's Exhibit 6 and summarized in plaintiff's Exhibit 7.

When computing figures as to Eugene Imes, Baumgardner was careful to differentiate the overtime hours worked as a dispatcher, which he was entitled to but had not received (Imes was one of the 14 employees covered in the stipulation) and the hours worked driving a cab. After adjusting Charles Showe's hours by the 20 minutes per day and then multiplying the adjusted hours times the applicable minimum wage, then subtracting the amount actually paid, a figure is obtained which is due the driver. By adding these figures, in Showe's case from 1975–1978, a total figure of $1,673.42 is obtained.

Plaintiff's Exhibit 7 is a summary of the aggregate unpaid wages with the adjusted times which total $68,076.53 [8] minus the $4,097.87 stipulated to as overtime for dispatchers and gas attendants.

The burden in FLSA cases such as this is reasonably clear. Where the employer's records are "inaccurate or inadequate,"

> we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate. . . . It is enough under these circumstances if there is a basis for a reasonable inference as to the extent of the damages. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687–88, [66 S.Ct. 1187, 1192, 90 L.Ed. 1515] (1946).

*Accord, Hodgson v. Elm Hill Meats*, 463 F.2d 1186, 1187 (6th Cir. 1972); *Wirtz v. Lieb*, 366 F.2d 412, 414–15 (10th Cir. 1966).

Defendants first argue that the time spent in the beginning of the driver's shift and at the end was preliminary to and postliminary to their principal activity, to drive cabs. 29 U.S.C. § 254(a)(2). As mentioned earlier, while there was some evidence that the drivers did not begin to work until the yellow tickets were punched, the credible evidence is that there were activities performed by the drivers during this time which were integral to their driving the cab. The Court in *Steiner v. Mitchell*, 350 U.S. 247, 76 S.Ct. 330, 100 L.Ed. 267 (1956) examined the legislative history behind the portal-to-portal provisions, sections 2 (29 U.S.C. § 252) and 4 (29 U.S.C. § 254), as applicable to the FLSA. As relevant to this case, the Court affirmed the trial court's determination that under the facts of the case, the changing into clothes at the beginning of the shift and disrobing and showering at the end is an "indispensable part of the principal activity of the employment." *Id.* at 256, 76 S.Ct. at 335. The employees in *Steiner* worked in a battery plant in which dangerous chemicals permeated the entire atmosphere of the plant. In *Mitchell v. King Packing Co.*, 350 U.S. 260, 76 S.Ct. 337, 100 L.Ed. 282 (1956) announced the same day as *Steiner*, the Court examined a less caustic situation—the knife-sharpening activities of the respondent's butchers. *Id.* at 261, 76 S.Ct. at 338. The Court concluded that since the butchers must use the various knives, albeit the purchasing and maintenance of the knives was the employer's responsibility, it was their responsibility to see that the knives remained in working order. This activity was likewise found to be compensable as an integral part of the butcher's principal activity. *Id.* at 262–63, 76 S.Ct. at 339.

The Court need not burden the record with a further examination of the history which led to the passing of the Portal-to-Portal Act, 29 U.S.C. §§ 251–262, as applicable to the FLSA. That was thoroughly accomplished in both *Steiner* and *Dunlop v.*

---

**8.** This figure was further reduced to $67,556.75 by the plaintiff subsequent to the trial to allegedly take into consideration the mathematical errors highlighted in Baumgardner's cross-examination.

*City Electric, Inc.*, 527 F.2d 394, 397–98 (5th Cir. 1976). The *Dunlop* court recognized that the term "principal activity or activities" was, as the Secretary of Labor interpreted the Congressional intent, to be liberally construed. *Id.* at 398. While citing examples of non-compensable activities, *id.* at 398–99 n.7, the Court of Appeals stressed certain factors in determining whether the particular activity is compensable. One factor is to determine for whose interest the activity is directed, the employer or employee. *Jackson v. Air Reduction Co.*, 402 F.2d 521, 523 (6th Cir. 1968). Correlative to this is whether any significant benefit accrues to the employer. *Dunlop v. City Electric, Inc.*, 527 F.2d at 399; *Merrill v. Exxon Corp.*, 387 F.Supp. 458, 464 (S.D.Tex. 1974). In *Cherup v. Pittsburgh Plate Glass Co.*, 350 F.Supp. 386 (N.D.W.Va.1972), aff'd mem., 480 F.2d 921 (4th Cir.), cert. denied, 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 474 (1973), the court found there was no significant benefit to the employer. Distinguishing Steiner, the court in *Cherup* held that the employees were in fact compensated for showering and changing their clothes since this activity was accomplished within their eight hour shift. *Id.* at 392. Finally, in considering whether this exemption under the Portal-to-Portal Act is applicable and time spent by the drivers is not to be compensated, a common sense approach would appear to the Court to further both the FLSA and the Portal-to-Portal Act. *See Dunlop v. City Electric Inc.*, 527 F.2d at 398; *Merrill v. Exxon Corp.*, 387 F.Supp. at 464.

Defendant relies on *Anderson v. Mt. Clemens Pottery* and *E. I. DuPont DeNemours & Co. v. Harrup* as dispositive that the activities herein are both preliminary and postliminary to their principal activity. In *DuPont* , cashiers at a cafeteria arrived a few minutes early to receive and count the money given to them by the previous cash-

ier. The company later made this a practice, closing the cafeteria long enough to perform this activity. "The direct testimony clearly shows that the work performed in accepting the transfer consumed much less than ten minutes of time; and this testimony is buttressed by the obvious fact that the counting of $200 and the reception of information must have consumed a very much shorter period." 227 F.2d at 135. The Court of Appeals also concluded that the work performed was so insignificant and so short in time as to fall within the *de minimis* rule.[9]

The Court in *Anderson* reversed and remanded the case to determine whether certain activities were merely preliminary to or an integral part of their principal activity. 328 U.S. at 694, 66 S.Ct. 1187, 1195, 90 L.Ed. 1515.

Defendants rely on *Anderson* not so much for the factors which determine whether preliminary or postliminary activities are an integral part of the principal activity, but rather whether the activities, even if compensable, are *de minimis*. In *dicta*, the Court stated:

[t]he workweek contemplated by § 7(a) must be computed in light of the realities of the industrial world. When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. Split-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act. It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved. The *de minimis* rule can doubtless be applied to much of the walking time involved in this case, but the precise scope of that application can be deter-

---

9. Plaintiff suggests that *DuPont* retains no vitality given the subsequent decisions of the Supreme Court in *Steiner* and *King Packing Co.* a few months after *DuPont* was decided. Plaintiff points to the avowedly liberal construction of principal activity given by the court in *Dunlop v. City Electric, Inc.*, 527 F.2d

394, 399 (5th Cir. 1976) as the more enlightened view. Nevertheless, one court has, given the facts before it, found *DuPont* very persuasive post-*Steiner* and *King Packing*. *Hodgson v. Katz & Besthoff, # 38, Inc.*, 365 F.Supp. 1193, 1196–97 (W.D.La.1973).

mined only after the trier of facts makes more definite findings as to the amount of walking time in issue. *Id.* at 692, 66 S.Ct. at 1195.

As stated earlier (*supra* at 749–750, if only alleged preliminary activities were involved in this case, the Court would have no compunction in invoking the *de minimis* rule. *See Cherup v. Pittsburgh Plate Glass Co.,* 350 F.Supp. at 392. There is, however, much more. Bordering on the repetitious, the credible evidence is that the drivers spent time in the morning in picking up the manifest sheets and purse, preparing the cab by sometimes gassing it up or cleaning it out, all prior to being paid. Once on the clock, the credible evidence is that the dispatchers, upon word that a driver was taking a break, generally would take that driver off the clock by time-stamping a yellow ticket. At the end of the shift, the driver would literally end his day upon radioing the dispatcher that he had just dropped off his last passenger and was heading back to the office. Upon arriving at the office, the driver had to take the manifest sheet and purse in, sometimes wait in line, and then sometimes go over the sheet with Showe or a dispatcher. *See Blum v. Great Lakes Carbon Corp.,* 418 F.2d 283, 287–88 (5th Cir. 1969), *cert. denied,* 397 U.S. 1040, 90 S.Ct. 1361, 25 L.Ed.2d 651 (1970). There is involved in this case more than insignificant travel or personal activities for the benefit of the employee. *See* 29 C.F.R. § 785.16(b) (1979). The Court finds *DuPont* factually distinguishable.

The Fifth Circuit in *Dunlop* stated the standard succinctly. "The test, therefore, to determine which activities are 'principal' and which are 'an integral and indispensable part' of such activities, is not whether the activities in question are uniquely related to the predominant activity of the business, but whether they are performed as part of the regular work of the employees in the ordinary course of business." *Dunlop v. City Electric, Inc.,* 527 F.2d at 400–01. The Court sees no impropriety with the *method* utilized by Baumgardner in determining the minimum wage violations and uncompensated time, or in his determination that 20 minutes, given the facts of this case, was fair and reasonable.

■ Baumgardner, on cross-examination testified that he did not take into consideration the fact that neither tips nor full fares on a given shift (knock-downs) were reported. The Court permitted questions as to how much each driver made in tips, but sustained objections to questions as to whether they reported the tips to Snyder, Showe or a dispatcher. The basis of the Court's ruling was the failure of the defendant to satisfy the factual and legal predicate to any testimony coming in concerning the non-reporting of tips as set forth in 29 U.S.C. § 203(m) and *Richard v. Marriott Corp.,* 549 F.2d 303 (4th Cir.), *cert. denied,* 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1100 (1977). Section 203(m) provides, in part, that:

> [i]n determining the wage of a tipped employee, the amount paid such employee by his employer shall be deemed to be increased on account of tips by an amount determined by the employer, but not by any amount in excess of 50 [10] per centum of the applicable minimum wage rate, except that the amount of the increase on account of tips determined by the employer may not exceed the value of tips actually received by the employee. The previous sentence shall not apply with respect to any tipped employee unless (1) such employee has been *informed by the employer* of the provisions of this subsection, and (2) all tips received by such employee have been retained by the employee . . . . (emphasis supplied).

In *Richard,* the Court of Appeals stated that if the employer fully complies with this statutory requirement, they may obtain a percent credit toward the payment of the minimum wage. "The corollary seems obvious and unavoidable: if the employer does not follow the command of the statute he

---

**10.** Public Law 95-151, § 3(b)(1), 91 Stat. 1249, substituted "45" for "50" effective January 1, 1979. Public Law 95-151, § 3(b)(2), substituted "40" for "45" effective January 1, 1980.

gets no credit." *Richard v. Marriott Corp.*, 549 F.2d at 305. There was no credible evidence proved or proffered from either the drivers, Snyder or Showe as to what exactly had been told to the drivers concerning the tip credit provisions or even if any information was contained in any poster or bulletin provided to the drivers. Defendants cannot invoke these provisions without satisfying the clear requirements of prior notice to the employees. *E. g., Bonham v. Copper Cellar Corp.*, 476 F.Supp. 98, 100–01 (E.D.Tenn.1979). Thus, the retaining of tips by the drivers cannot offset the failure to pay the applicable minimum wage.

More troublesome is the credible testimony that knock-downs were a prevalent practice of the drivers. Baumgardner, on cross-examination testified that he did not take into consideration the question of knock-downs. According to Baumgardner, the issue was immaterial to his investigation. Plaintiff maintains the issue is equally irrelevant here in determining whether a violation of the minimum wage provisions of the FLSA have occurred.

Defendants maintain the issue is highly relevant. Had the drivers not knocked-down, their gross fares at the end of their shift would have been higher. If their gross fares were higher, their commission (40 or 50 percent) would have netted them a higher amount. This alleged higher amount would have then added up to the applicable minimum wage. Defendants posit, therefore, that any alleged violations of minimum wage were occasioned by the drivers themselves, and that they should not be permitted to be twice compensated. Mr. Snyder testified that he recognized the problem, but that if a driver denied this practice upon turning in his manifest sheet and purse, there was nothing he (Snyder) could do. Mr. Durbin testified that he was aware of the severity of the problem and had considered obtaining meters for the cabs. Defendants conclude that the fact of knock-downs offsets liability on their part for minimum wage violations.

Plaintiff relies, in part, on *Mayhue's Super Liquor Stores, Inc. v. Hodgson*, 464 F.2d 1196 (5th Cir. 1972), *cert. denied*, 409 U.S. 1108, 93 S.Ct. 908, 34 L.Ed.2d 688 (1973). In *Mayhue*, the employer had required employees "as a condition of employment, to sign agreements providing that the employees would make 'voluntary' repayments of cash register shortages." *Id.* at 1197. The Court of Appeals concluded that to give the agreement legal credence would be waiving the minimum wage requirements of the FLSA. *Id.* at 1199. In *Brennan v. Heard*, 491 F.2d 1 (5th Cir. 1974), the district court permitted "set-offs against the amount due in back pay from employees for the value of goods, including gas and supplies from the company store . . . ." *Id.* at 3. By reducing the amount by these deductions, many of the individual awards were below the applicable minimum wages. Relying on the earlier case of *Brennan v. Veterans Cleaning Service, Inc.*, 482 F.2d 1362 (5th Cir. 1973), the Court stated that "[t]he federal courts were not designated by the FLSA to be either collection agents or arbitrators for an employee's creditors. Their sole function and duty under the Act is to assure to the employees of a covered company a minimum level of wages." *Brennan v. Heard*, 491 F.2d at 4. The Court concluded that:

> [s]et-offs against back pay awards deprive the employee of the cash in hand contemplated by the Act, and are therefore inappropriate in any proceeding brought to enforce the FLSA minimum wage and overtime provisions, whether the suit is initiated by the individual employees or by the Secretary of Labor. *Id.*

While the cases cited by the defendants, *e. g., Haber v. American Corp.*, 378 F.2d 854 (9th Cir. 1967), are legally distinguishable, the line of Fifth Circuit cases cited by the plaintiff are factually inapposite. In *Veterans Cleaning Service*, for example, the defendant deducted from an employee's wages a certain amount per weekly paycheck because of property damage to the company's truck and another car which the employee had caused. 482 F.2d at 1368 n. 4. These deductions, resulting in the net

amount the employee received being less than the minimum wage, was truly a set-off, thus violating the minimum wage provisions of the FLSA. This requirement of the employer to pay wages that are "free and clear" (or finally and unconditionally) to the employee, 29 C.F.R. § 531.35 (1979), necessitated, as stated earlier, that the employer not set-off an amount due from supplies that plaintiff had purchased from back pay. *Brennan v. Heard*, 491 F.2d at 3. Nor could an agreement violate the salutary effect of the minimum wage requirements. *Mayhue's Super Liquor Stores, Inc. v. Hodgson*, 464 F.2d at 1197–98. Set-offs, however, are not involved here. Most of the driver witnesses who testified on behalf of the plaintiff who freely admitted engaging in knock-downs stand to gain a monetary award from violations of minimum wage requirements. To allow the very parties who stand to benefit without taking into consideration the apparent across-the-board conduct of knock-downs would lead to an incongruous result. If the amounts of knock-downs were added to the daily purse, it is obvious the driver's weekly wages would have correspondingly risen. It would not be fair, however, to deny (as defendants request) any money based on the impermissible assumption that but for the knock-downs each driver for Gerwill would have been paid the minimum wage. The defendants could have taken another route in handling these knock-downs, rather than merely ignoring them.

■ Plaintiff further argues that the monetary evidence as to knock-downs is far too specious in this case to reduce the back wages. Just as proof of damages need not be mathematically set forth (*supra* at 750), *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. at 687–88, 66 S.Ct. 11 at 1192, 90 L.Ed. 1515, proof as to knock-downs need not be exact. The credible evidence is that they existed. The testimony ranged from $2 to $3 a week for Wade Hornbaker to $20 to $22 for Eugene Imes. From the credible evidence, the Court deems $5 per week per driver as a fair and permissibly inferable amount as knock-downs, and the amount of the award shall be reduced accordingly.

Also, the Court of Appeals in *Brennan v. Heard*, 491 F.2d 1 (5th Cir. 1974) cited to a portion of *Mayhue* which recognized certain exceptions to the cash in hand requirement.

Where the employee has previously misappropriated funds, temporary reductions below the statutory minimum have been permitted in order that the employer might recoup his losses. 'In such a case, there would be no violation of the Act because the employee has taken more than the amount of his wage and the return could in no way reduce his wage below the minimum.' 491 F.2d at 4 n. 2 (quoting 464 F.2d at 1198).

### Statute of Limitations

■ 29 U.S.C. § 255(a) of the Portal-to-Portal Act, as applicable to the FLSA, provides that a cause of action "may be commenced within two years after the cause of action accrued, . . . except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." As the Court of Appeals for the District of Columbia pointed out in *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429 (D.C.Cir.1976), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1977) (construing the Equal Pay Act), the standard for determining willfulness is less than uniform. *Id.* at 459; Note, *Standards of Willfulness Under the Fair Labor Standards Act*, 78 Mich.L.Rev. 626, 627–28 nn. 8 & 9 (1980); *Marshall v. J. C. Penney Co., Inc.*, 464 F.Supp. 1166, 1194 (N.D.Ohio 1979). The Fifth Circuit simply examines the credible evidence as to whether the employer knew the FLSA was applicable to the activities of his employees. *Laffey v. Northwest Airlines, Inc.*, 567 F.2d at 459 nn. 206 & 207 (quoting *Coleman v. Jiffy June Farms, Inc.*, 458 F.2d 1139, 1142 (5th Cir. 1971), *cert. denied*, 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972)). Other courts have required evidence of deliberateness, voluntariness and intent. *See Laffey v. Northwest Airlines, Inc.*, 567 F.2d at 459 nn. 208 & 209 (and cases cited therein). This Court, as did the Court in *Laffey*, need

not set a definitive standard.[11] There is an abundance of credible testimony from Baumgardner and from Durbin himself (both at trial and in his deposition) that leads to the conclusion that Local Leasing had problems when Durbin first became its caretaker in June of 1975 in complying with the FLSA and that these problems never ceased. Because the Court also finds that Durbin is an employer within the meaning of 29 U.S.C. § 203(d), this lends credence to the conclusion that Durbin was sufficiently aware of the activities of Local Leasing to be cognizant that there were continuing violations of the minimum wage provisions as to his drivers and others. *See Marshall v. A & M Consol. Independent School Dist.*, 605 F.2d 186, 190–91 (5th Cir. 1979). The credible evidence shows that the violation was willful within the meaning of the FLSA.

### Individual Liability of Durbin

█ Plaintiff contends that Durbin is jointly and severally liable with Gerwill for the FLSA violations which have been found to exist in this case. The testimony of Snyder and Showe that they, in effect, ran the business, is incredulous. Likewise, Durbin's testimony that, after three months of this acting as a caretaker for the business, he no longer was involved in the running or control of Local Leasing is also incredulous. While Showe may have, as she testified, done most of the hiring and firing, the credible testimony is that the ultimate control was vested in Durbin. Indeed, if credence were given to Snyder and Showe's testimony, the conclusion would be that the daily activities of Local Leasing ran themselves. 29 U.S.C. § 203(d) provides that an " '[e]mployer' includes any person directly or indirectly in the interest of an employer in relation to an employee. . . ." While Snyder and Showe may have performed many of the functions of an employer, they did so under the direction and ultimate control of Durbin. Affording the FLSA the liberal construction mandated, the Court has no hesitation in finding Durbin an "employer" within the statutory scheme. *See Shultz v. Falk*, 439 F.2d 340, 344–45 (4th Cir.), *cert. denied*, 404 U.S. 827, 92 S.Ct. 62, 30 L.Ed.2d 56 (1971); *Wirtz v. Lone Star Steel Co.*, 405 F.2d 668, 669–70 (5th Cir. 1968); *Schroepfer v. A. S. Abell Co.*, 48 F.Supp. 88 (D.Md.1942), *aff'd*, 138 F.2d 111 (4th Cir. 1943), *cert. denied*, 321 U.S. 763, 64 S.Ct. 486, 88 L.Ed. 1060 (1944).

### Pre-Judgment Interest on Back Wages

█ Plaintiff requests the Court to award pre-judgment interest on the back wages awarded. Numerous authorities are set forth in *Marshall v. Bd. of Educ. of Baltimore County*, 470 F.Supp. 517, 519–20 (D.Md.1979) which lead this Court to the inescapable conclusion that pre-judgment interest is appropriate. To deny pre-judgment interest in this case, with the violations occurring from the fall of 1975 until June of 1978 would, in effect, punish the employees and thwart the remedial nature of the FLSA. The weight of authority would, even in the face of an employer's good faith, appear to permit pre-judgment interest. *E. g., Brennan v. Maxey's Yamaha, Inc.*, 513 F.2d 179, 183 (8th Cir. 1975); *Brennan v. City Stores, Inc.*, 479 F.2d 235, 241–42 (5th Cir. 1973); *Marshall v. Bd. of Educ. of Baltimore County*, 470 F.Supp. at 519. In *Mayhew, Inc. v. Wirtz*, 413 F.2d 658 (4th Cir. 1969), the Court of Appeals indicated that the trial court did not abuse its discretion in refusing to award pre-judgment interest. For the reasons set forth in this Memorandum and Order, fairness dictates that the employees (drivers) be made whole; this warrants, in the Court's discretion, an award of pre-judgment interest. The Plaintiff, upon recomputing the

---

11. "We think that at the very least the employer's noncompliance is 'willful' when he is cognizant of an appreciable possibility that he may be subject to the statutory requirements and fails to take steps reasonably calculated to resolve the doubt." *Laffey v. Northwest Airlines, Inc.*, 567 F.2d at 461–62.

Likewise, the Court is aware that a statute of limitations defense, as asserted by defendants, should be pleaded as an affirmative defense. *Hodgson v. Humphries*, 454 F.2d 1279, 1283–84 (10th Cir. 1972); *Marshall v. American Motors Corp.*, 475 F.Supp. 875, 883–84 (E.D.Mich. 1979).

amount of back wages as the Court has set forth, will also compute the applicable interest that is due.

### Injunction

Finally, plaintiffs ask that both Gerwill and Durbin be enjoined from further violations of the FLSA. It is clear that Gerwill no longer owns Local Leasing, having sold the business in June of 1978 (*supra* at 746). While Gerwill still exists, it appears to be doing no further business. Durbin still maintains, apparently, his auto service in Hagerstown. It is clear that while the determination of whether an injunction should issue under 29 U.S.C. § 217 is within the discretion of the trial court, that discretion has its limits. *Dunlop v. Davis*, 524 F.2d 1278, 1280 (5th Cir. 1975). "An injunction under § 217 is 'remedial in nature; i. e., intended to prevent future violations; it is not imposed as punishment for past violations.'" *Usery v. Johnson*, 436 F.Supp. 35, 45 (D.N.D.1977) (quoting *Brennan v. Correa*, 513 F.2d 161, 163 (8th Cir. 1975)).

The Court concludes that under the facts of this case, an injunction should not be issued. In *Dunlop*, the Fifth Circuit [12] reversed the district court stating that the court's findings of "overall bad faith" and "devious and deceptive conduct" were not synonymous with a finding that an injunction was not warranted. 524 F.2d at 1281. In examining the conduct of the employee during the period of wage and hour improprieties and his assertions, both pre- and post-investigation of future compliance with FLSA, the *Dunlop* court held that the district court should have issued the injunction. *Id.*

▮ While perhaps not burdensome, *Hodgson v. Approved Personnel Serv. Inc.*, 529 F.2d 760, 764 (4th Cir. 1975), a prospective injunction *given the facts of this case* is not warranted. Unlike the facts in *Dunlop*,

there was no credible evidence that Gerwill or Durbin individually exhibited, for example, any maliciousness, any bad motive, or gained any monetary benefit from Local Leasing. *See Dunlop v. Saghatelian*, 520 F.2d 788, 790 (9th Cir. 1975). The credible evidence is that Durbin lost money or at best broke even after the sale to Turner Taxi. The credible evidence is also that the payroll practices of Local Leasing had remained the same after Gerwill (Durbin) purchased the business in 1975. This does not excuse Durbin from individual liability or weaken the Court's earlier conclusion that a three year statute of limitations is justified. As Durbin allegedly told Baumgardner, he (Durbin) was simply not making any money and that if a rate increase was approved, he would pay the driver's back wages to comply with the minimum wage requirements. This is not a case where the employer sought to deceive the Department of Labor by doctoring its payroll records or otherwise inhibiting its investigation. *See Hodgson v. Humphries*, 454 F.2d 1279, 1284 (10th Cir. 1972). Gerwill no longer is in the taxicab business and there was no evidence or even inferences that the plaintiff has had problems or complaints with any of Durbin's other business endeavors. The Court, in its discretion, will not enter a permanent injunction. *See Marshall v. Elks Club of Huntington, Inc.*, 444 F.Supp. 957, 968–69 (S.D.W.Va.1977); *Usery v. Johnson*, 436 F.Supp. at 45–46.

In summary, plaintiff's claim for back wages as supplemented with the 20 minutes of uncompensated time is granted. The case is, however, remanded to the plaintiff to reduce that amount for each driver by $5 per week representing the knock-down factor, and to compute the applicable pre-judgment interest on the new total. Also, the plaintiff will correct any errors in computation that presently exist, including the request on behalf of Leon C. Fearnow.[13]

---

12. The Fifth Circuit in its own words, "has not hesitated to reverse district courts for refusing to enjoin future violations." *Dunlop v. Davis*, 524 F.2d at 1281.

13. The request of $18.43 in back pay for Leon C. Fearnow is disallowed. Mr. Fearnow was,

at the time he drove a cab, a police officer performing an activity in his line of duty. If there are any other examples where a driver is not due any amount, the Court will assume the plaintiff, upon recomputation, will apprise the Court.

There was no request for liquidated damages and none is allowed. While both Gerwill and Durbin are jointly and severally liable for the back wages due, no injunction shall be issued.

Plaintiff shall provide the Court with an Order by August 29, 1980 of the recomputed figures, together with the applicable prejudgment interest.