James P. MITCHELL, Secretary of Labor, United States Department of Labor, Appellant,

v.

MITCHELL TRUCK LINE, INC., Appellee.

No. 18412.

United States Court of Appeals
Fifth Circuit.

Jan. 31, 1961.

Robert E. Nagle, Atty., Dept. of Labor, Washington, D. C., Earl Street, Atty., Dept. of Labor, Dallas, Tex., Bessie Margolin, Asst. Sol., Harold C. Nystrom, Acting Sol., Dept. of Labor, Washington, D. C., for appellant.

J. Edwin Smith, Arthur F. Thomson, Houston, Tex., Smith & Lehmann, Houston, Tex., of counsel, for appellee.

Before CAMERON and BROWN, Circuit Judges, and HANNAY, District Judge.

JOHN R. BROWN, Circuit Judge.

We deal here with the problem of the sufficiency of proof of damages for underpayment of minimum wages and overtime under the Fair Labor Standards Act, 29 U.S.C.A. §§ 201–219. The District Court, being of the strong view that fixing some dollar amount would involve speculation, dismissed the actions altogether despite the convincing showing that some work was regularly done without compensation as required by the Act. We disagree and reverse. In doing so we must also consider the question

whether prosecution of these suits by the Secretary of Labor for the eight individual workers amounts to forbidden barratrous solicitation.

The suit was filed by the Secretary on behalf of eight truck drivers who had worked for the employer, Mitchell Truck Line, Inc. The employer, as its name implies, was engaged in the business of transportation. It maintained a fleet of trucks of variable sizes which were used in hauling sand, gravel, asphalt hot-mix, dry concrete batch, and similar materials. So far as this record reveals, substantially all of its work was done for prime contractors on highway construction and rehabilitation jobs. Its principal truck yard was maintained in Houston, although when hauling for some contractors on major projects far removed from Houston, suitable temporary truck yards would be established.

The drivers were generally paid by the hour. But on some kinds of work and perhaps some types of trucks, pay was on a piece-load basis. The hourly wage ostensibly met the statutory minimum, but whether it or the wages based on piece-work were actually sufficient for straight and overtime under the statute depended on the time the drivers were actually "working" for the employer. The solution of that problem relates primarily to the time spent in these activities: (a) checking oil, grease, water, tires, etc. at the truck yard each morning; (b) driving from truck yard to the prime contractor's road-materials-plant for loading; (c) waiting in line to be loaded at the materials plant; (d) idle time awaiting repair after breakdown of truck; (e) returning to truck yard from place where last load was dumped on contractor's job site; and (f) cleaning up truck and refueling at truck yard at the day's end.

As the case was tried by the Judge after hearing all of the use-plaintiffs in open Court, the fact findings come here with the substantial buckler and shield of F.R.Civ.P. 52(a), 28 U.S.C.A. Rea Construction Co. v. B. B. McCormick & Sons, 5 Cir., 1958, 255 F.2d 257, 258.

But in arriving at a contrary result we do not credit any testimony rejected by the District Judge, nor do we reject any credited by him. We can agree wholeheartedly with the Judge that in many respects the evidence was most unsatisfactory. And yet the whole burden of the record convincingly demonstrates some things to be virtually undisputed. It is on these that the District Court made its error.

The drivers as a general rule reported to the employer's truck yard between 5:00 and 6:00 a. m. The drivers to be used that day were given their orders by the foreman. Each driver selected for work was then expected to make a routine check of the fitness of his truck. This included checking the air in the tires, water and oil for the motor, and if not done the night before, refueling with gasoline. This took in the neighborhood of 10 to 15 minutes. With that done, the driver then had to go from the employer's truck yard to the materials plant. When the operations were conducted in and near Houston, the trip from the employer's truck yard to the batch asphalt, or other material plant of the prime contractor, generally took 15 to 30 minutes depending on traffic. When a temporary truck yard was set up by the employer for operations distant from Houston, the time and distance were in some instances perhaps shorter. But one such project referred to in the evidence involved a distance of 12 miles which, again, at reasonable speed meant a time of 25 to 30 minutes. Upon arrival at the materials plant, the trucks would line up for loading presumably under a hopper or loading crane. When loaded, they would depart for the construction job site at which point they would dump the material as directed. The drivers had nothing to do with spreading or handling the materials at the job site. Except for occasional and unscheduled disruptions either from a plant or truck breakdown, this kept on during the day. After delivering the last load to the construction job site, the truck would then proceed back to the employer's truck yard. Either while en route

724

(at some suitable place) or at the employer's truck yard, the driver would then have to clean up the truck by scraping the body free of any residue materials hauled that day. And at the truck yard he would refuel the truck with gasoline. This could take quite some time depending on the number of trucks in line at the gasoline pumps. The trucks were then parked and the men went home by their own means.

What the drivers had to do—summarized above—was undisputed. Not so clear was the time at which wages were thought to begin. We say "thought to begin" because a number of these drivers—with limited education and an expressed apprehension to press inquiry or complaint too far lest they lose employment—could merely say that they understood, or considered, or thought that their time began and ended at a certain point. Were this all, we would most certainly uphold the conclusion of the District Judge that proof was inadequate. And in that process we would reject, just as he did, the farfetched assertion of 4 and 5 hours daily uncompensated time supposedly supported by little black record books, all of which, oddly enough, were lost or thrown away.

■ But that is not all. Based on testimony of one of the executive officers of the employer, and admissions made by another which were testified to by the Wage and Hour Investigator without in any way thereafter being contradicted, it is clear that time did not begin until the truck was loaded at the materials plant. For none of the activities in (a), (b) or (c) did the employer pay compensation. At the other end of the day it is likewise positive that no work in (f) was paid for. And on the whole, especially the uncontradicted admission of the employer,[1] we think it undisputed that pay stopped when the last load was dumped, so category (e) went unpaid as well. Indeed, we think the District Judge concluded as much. For in the colloquy at the end of the evidence, the Judge categorically stated, "I do think that they did work time they were not compensated for, and I so find." And just previously he had declared, "I believe there is time that was not compensated for." [2]

■ On the basis of this undisputed or at least overwhelmingly established conclusion there can be no serious question about coverage and hence a liability on the employer for *some* amount. The material was being transported for direct use on construction or maintenance projects on existing interstate arterial highways. Mitchell v. Hooper Equipment Co., 5 Cir., 1960, 279 F.2d 893. And while urged below there is but a faint echo here that the work was within the exception of the Portal-to-Portal Act, 29

1. The employer's executive admitted during the investigation that "the employees' pay began when they received their first load for the day and when they had unloaded at the project job site in the evening that their pay stopped at that particular time."

2. We recognize that comments of this kind, captured perpetually by court reporters' shorthand, must be used with care. A trial judge no more than an appellate judge should be bound irrevocably by an offhand statement which on mature consideration turns out to be unfounded. Hence, where formal findings and conclusions later entered are in conflict, we would certainly look to them alone whether prepared by the Judge or for him by counsel under local practice. Hig-

gin, Inc. v. Tex-O-Kan Flour Mills Co., 5 Cir., 1960, 274 F.2d 263, 265, 266; O/Y Finlayson-Forssa A/B v. Pan Atlantic S.S. Corp., 5 Cir., 1958, 259 F.2d 11, 18, 1958 A.M.C. 2070, 2079; Mississippi Shipping Co. v. Zander & Co., 5 Cir., 1959, 270 F.2d 345, 1959 A.M.C. 2143, 273 F.2d 618, 1960 A.M.C. 247. But here the only formal finding is one couched in terms of a legal conclusion that the named plaintiffs "have failed to show from a preponderance of the evidence that the [employer] has failed and refused to compensate them * * * for their employment at rates not less than $1 per hour" or "for work in excess of 40 hours in each work week at a rate of not less than one and one-half (1½) times the regular rate at which they were employed."

U.S.C.A. § 254(a). Despite language used in permissibly leading questions that hauling this material was each driver's principal activity, coverage or the exemption is not to turn on such artful use of words. The work which these men did was to drive trucks. That was their sole, only and principal activity. The trucks, to be sure, were to haul particular kinds of things, but they could not do so unless the truck was driven. For the truck to be operated, it first had to be (a) serviced, then (b) driven from the truck yard to the material plant, (c) placed under a load and loaded, deliver its load and (e) return to the truck yard for clean up and (f) refueling at night. These activities were certainly such an integral part and so indispensable to the employees' main job as to be outside of the Portal-to-Portal exemption.[3]

■ But what troubled the District Judge was not coverage or the unavailability of an exemption. What seemed to lead him to an outright dismissal was his many times repeated concern about the availability of evidence which would enable him to translate this into dollars. We do not minimize his difficulties, some of which seem to us at this vantage point to have been augmented by the manner in which the cause was submitted. But we do have the conviction that he was laboring over a misconception of the legal standard to be followed. That being so, to the extent that the dismissal or the formal conclusions, see note 2, supra, represent fact findings under F.R.Civ.P. 52(a) they are not to be judged in the light of the clearly erroneous test. Henderson v. Flemming, 5 Cir., 1960, 283 F.2d 882; United States v. Williamson, 5 Cir., 1958, 255 F.2d 512, 515; Mitchell v. Raines, 5 Cir., 1956, 238 F.2d 186; Galena Oaks Corporation v. Scofield, 5 Cir., 1954, 218 F.2d 217.

■ The employer cannot really complain that matters are left in great uncertainty. It was required under the Act to do two principal things, (1) pay minimum wages and overtime, and (2) keep accurate time and wage records, 29 U.S. C.A. §§ 206, 207, 211. It certainly did not do the first since there was substantial worktime not compensated for as such. Nor was it shown by the employer to be within the statutory minimum on the basis of wages actually paid. Nor did it do the second.[4]

■ There was thus certainty of damage and the only uncertainty was as to its extent. That brings into play the now familiar principle which we have applied in many situations.[5] "Though damages cannot be ascertained by a fixed rule and must be based upon estimates and opinion, it does not follow that no damages should be allowed or that the award should be merely nominal," for " 'The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery.' " Robey v. Sun Record Co., 5 Cir., 1957, 242 F.2d 684, 689, 690. And there has been, of course, a peculiar necessity for applying these principles to FLSA cases, Mitchell

---

3. See especially D. A. & S. Oil Well Servicing, Inc. v. Mitchell, 10 Cir., 1958, 262 F.2d 552; Steiner v. Mitchell, 1956, 350 U.S. 247, 76 S.Ct. 330, 100 L.Ed. 267; Mitchell v. King Packing Co., 1956, 350 U.S. 260, 76 S.Ct. 337, 100 L.Ed. 282.

4. Only after investigation by a Wage and Hour Investigator was it possible to reconstruct payroll records. And this record, used as a stipulated exhibit, showed only the hours for which the men were paid in any given week. There were no records showing times prior to loading or after delivery of last load, the number of days worked each week, etc.

5. See also Livesay Window Co. v. Livesay Industries, Inc., 5 Cir., 1958, 251 F. 2d 469, 472. These cases apply the principles enunciated in Story Parchment Co. v. Paterson Parchment Paper Co., 1931, 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544, 548; Palmer v. Connecticut Railway & Lighting Co., 1941, 311 U.S. 544, 560–561, 61 S.Ct. 379, 85 L. Ed. 336, 342–343; Bigelow v. RKO Radio Pictures, 1946, 327 U.S. 251, 263–266, 66 S.Ct. 574, 90 L.Ed. 652, 659–661.

v. Strickland Transportation Co., 5 Cir., 1955, 228 F.2d 124, 128–129; Foremost Dairies v. Ivey, 5 Cir., 1953, 204 F.2d 186, at page 188.

■ Indeed, this very situation is the one dealt with in Anderson v. Mt. Clemens Pottery Co., 1946, 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515, where work not compensated for is performed, but the employer's records are inaccurate or inadequate. "The solution * * * is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act. In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate. * * *." 328 U.S. at pages 687–688, 66 S.Ct. at page 1192.

6. On the present record, at least, we think element (d), idle time awaiting repairs, finds no substantial support, and in any case the time seems *de minimus*.

7. If the Court concludes a master is reasonably required, it is inescapable that this flows directly from the failure of the employer to comply with the Act on payment of statutory minimum wages and record keeping and the expenses of such a reference could well be treated as a like consequence. F.R.Civ.P. 53(a).

8. The authority of the Secretary under 29 U.S.C.A. § 216 to bring an action after

■■ In his insistence upon a preponderance of evidence showing some "formula" by which to calculate dollars the Trial Judge failed to apply the teachings of this beneficent principle. Precisely because it was this underlying error in law which brought about the Court's decision, we think it would be improper for us to attempt here to fix or determine what the awards should be. What they are to be must be the initial judgment of the Trial Judge.[6] It may well be that in this process the Court will feel that further evidence should be taken. And clearly, since major issues will have been determined by the Court on the existence of coverage and substantial work not compensated for, it will certainly be the kind of case in which the Judge, in his discretion, could refer this accounting phase of the case and related matters to a master.[7] F.R.Civ.P. 53(b). In re Watkins, 5 Cir., 1959, 271 F.2d 771.

■ Finally the employer asserts that the Trial Court lacked jurisdiction since the right of the Secretary to bring suits for the employees after advising them of their rights amounts to solicitation and therefore presents a novel question not heretofore settled and hence under the ban of the 1949 Amendments.[8] 29 U.S.C.A. § 216(c).

The District Court formally found that each of the employees were "solicited by the Regional Director * * * to file a request with the" Secretary, and that "Such solicitation was the moving and primary cause of the filing of each request." This was based on a letter sent

a written request filed by an employee is expressly conditioned: " * * * *Provided*, That this authority to sue shall not be used by the Secretary of Labor in any case involving an issue of law which has not been settled finally by the courts, and in any such case no court shall have jurisdiction over such action or proceeding initiated or brought by the Secretary of Labor if it does involve any issue of law not so finally settled. * * *" See, e. g., Mitchell v. Emala & Associates, Inc., 4 Cir., 1960, 274 F. 2d 781.

to each of the employees from the Regional Office advising the employee that investigation showed that such employee had not been paid wages required by the Act and that on written request from the employee the Secretary could file a suit. The letter carefully stated that the "Department of Labor does not encourage or discourage such suits. The decision is entirely up to you." Likewise it stated that "the Secretary of Labor will decide whether or not a suit will be filed." Each employee sent a written request and this suit followed.

The Court quite understandably thought that had such a letter been written by a practicing attorney, such conduct would have constituted flagrant solicitation and the barratrous stirring up of litigation. But the Secretary was not writing as a lawyer. And in any case, Congress in its wisdom has concluded as it has in other areas, that to effectuate the policy of the law, the Government may become an active protagonist for private interests and thereby vindicate public rights. Under the statutory scheme of this Act which, unlike many others, involves no administrative processing of cases, guidance, apart from litigated court decisions, comes in large part from Interpretative Bulletins and rulings issued from time to time by the Administrator. Skidmore v. Swift & Co., 1944, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124, 129; Mitchell v. City Ice Co., 5 Cir., 1960, 273 F.2d 560, 562, 563; cf. Mitchell v. H. B. Zachry Co., 1960, 362 U.S. 310, 80 S.Ct. 739, 4 L.Ed.2d 753. This comprehends, as we have said, "advising the public, employers and employees of the provisions of the Act and if and how the Department deems it applicable to them," Rogers v. Skinner, 5 Cir., 1953, 201 F.2d 521, 522. No one would question the right or duty to give an employer, or an employer group, information as to the probable application of the Act including specifically the likelihood that given conduct was a violation. Until Congress so legislates it is not for a court to say that it is wrong to give specific information of a like kind to an employee

as well. It is the policy of Congress in the Act that not only are employees able to be so informed but, upon their request, the Government is to supply counsel. That policy is hardly achieved in ignorance. The action is not improper, Wright v. Carrigg, 4 Cir., 1960, 275 F.2d 448, 450, and to assert that it is does not make the suit brought by the Secretary new and novel. Mitchell v. C & P Shoe Corp., 5 Cir., 1960, 286 F.2d 109.

Reversed and remanded.

CAMERON, Circuit Judge, concurs in the result.