**Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**KENTWOOD DEVELOPMENT COMPANY, INC., et al., Defendants.**

**Civ. A. No. J-81-708.**

United States District Court,
D. Maryland.

June 29, 1982.

---

Dale J. Belock, Atty., U.S. Dept. of Labor, Philadelphia, Pa., J. Fred Motz, U.S. Atty., Andre M. Davis, Asst. U.S. Atty., Baltimore, Md., for plaintiff.

Alan M. Perlman, Silver Spring, Md., John H. MacVey, Washington, D.C., for defendants.

### MEMORANDUM AND ORDER

SHIRLEY B. JONES, District Judge.

The Secretary of Labor filed this action under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201–219, against Kentwood Development Company, Inc. (KDC) and Charlene Baden, individually and as president of KDC. KDC and Baden were alleged to have failed to pay overtime compensation to 29 employees and overtime and minimum wage to one other employee and to have failed to comply with the recordkeeping requirements of the FLSA. Backpay, liquidated damages, and injunctive relief were sought.

Defendants stipulated that if FLSA coverage was found, backpay was owed to 22 employees for overtime in the amounts claimed. Pretrial Order ¶ 4(b). They also stipulated to an annual gross volume of business in excess of $250,000 for each of the years 1977, 1978, 1979 and 1980. Defendants contested coverage under the FLSA, claimed an exemption from the wage and hour laws for certain employees, disputed the amounts claimed for Martin J. Lobb, and claimed good faith reliance on administrative interpretations of the FLSA. The case was tried to this Court on November 4, 5, 6 and 25, 1981. The parties submitted posttrial memoranda on February

12, 1982. This opinion constitutes the Court's findings of fact and conclusions of law.

### Coverage under the FLSA

The corporate offices of KDC are located in Chevy Chase, Maryland. In 1976 it purchased an apartment complex, Kentwood Apartments, located in Landover, Maryland for conversion to cooperative ownership.[1] KDC operated the development from 1976 to 1980, selling mutual ownership contracts on units and also leasing units with an option to buy. It employed resident managers, rental clerks, maintenance and repair personnel and others during this period. By the end of 1980 all mutual ownership contracts were sold, and KDC ceased operation of the complex.

Sales or lease options were made in Maryland. KDC advertised the lease option program in the Washington *Post*. Printed fliers advertising the development were distributed in Maryland and the District of Columbia. In 1978, 1979 and 1980 employees of KDC received, handled and worked with goods ordered and received from suppliers in the District of Columbia and Maryland. The goods consisted primarily of equipment such as stoves, refrigerators, and cabinets; and repair or maintenance supplies. One of the main suppliers of general items was General Supply Corporation, Washington, D.C., to which KDC paid $5,805 in 1978, $10,963 in 1979, and $23,986 in 1980 (P.Ex.1). Other purchases were made from Maryland suppliers for goods that had previously traveled in interstate commerce, for example $23,012 for cabinets distributed by a Virginia firm (P.Ex.1).

Charlene Baden is, and was at the relevant times, president of KDC. Her own testimony and that of former employees established that she set its policies and closely controlled operations; she was the boss. She is an employer within the meaning of 29 U.S.C. § 203(d).

The FLSA applies to any "enterprise engaged in commerce or in the production of goods for commerce," 29 U.S.C. §§ 206(a) and 207(a), which is defined, in pertinent part, as an enterprise that has "employee handling, selling or otherwise working on goods or materials that have been moved in or produced for commerce by any person," *id.* § 203(s), and does a gross volume of business of at least $250,000 per year, *id.* § 203(s)(1). It is not disputed that the volume test is met. KDC employees handled various goods or materials, some of which had been moved in interstate commerce.

Defendants rely on 29 U.S.C. § 203(i), which defines "goods." After reciting what is included in the definition, the subsection adds, "but does *not* include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof." (Emphasis added). KDC contends that its employees handled or worked on goods only after delivery into the physical possession of KDC, the ultimate consumer. In 1974 Congress amended § 203(s) to its present wording, the key change being the addition of "or materials" after "goods." The change was made to clarify that the "handling" clause covered employees who handled goods consumed in their employer's operations, for example, soap used in a laundry. S.Rep. 93–690, 93d Cong.2d Sess. 17. This Court has found no decision of the United States Court of Appeals for the Fourth Circuit construing the amendment with the "ultimate consumer" exception. One other court of appeals and several district courts have held that local businesses whose employees use materials that have moved in interstate commerce are covered. *Marshall v. Brunner,* 668 F.2d 748, 748–52 (3d Cir.1982); *Marshall v. Davis,* 526 F.Supp. 325, 326–28 (M.D.Tenn.1981); *Marshall v. Baker,* 500 F.Supp. 145, 148–51 (N.D.N.Y.1980); *Marshall v. Sunshine & Leisure, Inc.,* 496 F.Supp. 354, 358–59 (M.D. Fla.1980); *Brennan v. Jaffey,* 380 F.Supp. 373 (D.Del.1974); *accord, Dunlop v. Indus-*

---

1. The development is owned by a cooperative association. Buyers purchased a mutual ownership contract, giving them the right to perpet- ual use of a particular townhouse and membership in the association.

trial *America Corp.,* 516 F.2d 498, 501–02 (5th Cir.1975) (dictum). *Jaffey, Baker* and *Davis* are particularly apposite. Each was an FLSA action against the owner-operator of an apartment complex in which coverage was upheld on the basis of employees' use of cleaning, maintenance and repair supplies in the course of the employer's business of managing the apartments.

■ A few cases specifically addressed the argument defendants make concerning the ultimate consumer exception of § 203(i) but have rejected it based on the legislative report cited above. *Brunner,* 668 F.2d at 751–52; *Davis,* 526 F.Supp. at 326–31; *Marshall v. Whitehead,* 463 F.Supp. 1329, 1336–38 (M.D.Fla.1978). The legislative history is brief concerning the reason for the 1974 amendment but rather clear that Congress intended to extend coverage to businesses that consumed interstate goods in the course of operation. KDC falls within the scope of the statute.

■ Defendants argue that Congress could not constitutionally extend coverage of the FLSA to this extent. That argument has been rejected by other courts. *Davis,* 526 F.Supp. at 328–31; *Baker,* 500 F.Supp. at 151–52. Congress may regulate intrastate activities that might have a substantial effect upon interstate commerce, *e.g., United States v. Darby,* 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941), and substantial effect is measured not only by the effect of the individual acts involved but also their aggregate effect, *e.g., Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). *Marshall v. Rose,* 616 F.2d 102, 104 (4th Cir.1980). The basis for the 1974 amendments can be determined from S.Rep. 93–690, to clarify Congressional intent to include employees handling goods consumed in their employers' businesses within the Act. The report notes the reason for the handling clause:

The "handling" language was added based on a retrospective view of the effect of substandard wage conditions.

While the original Act recognized the effect of such conditions on subsequent interstate *out*flow of products, it was not until the 1961 amendments that Congress specifically recognized their effect on the prior interstate *in*flow, based on the "obvious economic fact that demand for a product causes its interstate movement quite as surely as does production."

S.Rep. 93–690 at 17. Congress had a rational basis for the addition of the "handling" clause, and the same basis extends to the 1974 amendments.

### Exemptions claimed

■ Defendants claimed that eight resident managers and others fell within the FLSA exemption from coverage for administrative employees. The exemption depends on the nature of the employees' duties and the basis of their pay. 29 C.F.R. §§ 541.202–.213 (1979). If employees are actually paid on an hourly rather than a guaranteed salary basis, regardless of the kind of duties performed, they are covered by the wage and hour laws. *Id.* § 541.212 (incorporating § 541.118). The evidence at trial demonstrated, and defendants conceded in their posttrial memorandum, that the employees for whom the exemption was claimed except Martin Lobb were actually paid on an hourly basis. The exemption does not apply. Plaintiff proved, based on defendants' payroll records, that time and a half for hours worked in excess of forty per week, or 86 hours semimonthly, was not paid.

■ The situation is different with respect to Martin J. Lobb. His pay was calculated on a draw vs. commission basis. He received a $500 commission on each sale and a $100 commission for every ten lease option contracts he secured. Commissions earned were credited toward a monthly draw of $500, paid $250 semimonthly, which he received regardless of whether he had made any sales for the month. Lobb also received a rent-free townhouse, valued at $200 per month, during the period of full-time employment. Lobb's pay arrangements meet the requirements of 29 C.F.R. § 541.212 (1979), which incorporates 29 C.F.R. § 541.118, in that Lobb received compensation regardless of the number of hours worked.

A final requirement for application of the exemption is that the employee receive a minimum compensation, exclusive of board or lodging, of at least $335.84 semimonthly or $671.67 monthly. *Id.* § 541.211. The fixed portion of Lobb's salary, exclusive of lodging, did not meet the criteria, and it is the "guaranteed" portion that determines whether the exception applies. *See id.* § 541.118(b). The exemption does not apply to Lobb.

### Payment of Martin Lobb

The Secretary sought backpay in the amount of $3,987.41 for failure to pay minimum wage and overtime to Martin J. Lobb.[2] The amounts claimed are calculated based on an average work week of 75 hours. The Compliance Officer's computations (P.Ex.2) were based on information supplied by Lobb, corroborated by other employees, who recalled that Lobb worked long hours (T. 206–07, 221, 247–50). David R. Kinsley, the Labor Department Wage and Hour Division compliance officer who investigated KDC, testified that when he met with Charlene Baden and reviewed company payroll and time records, there were no time sheets for Lobb and Baden told him there were none. (T. 206, 430). Lobb testified that he submitted semi-monthly time sheets (T. 182, 192–93). Defendant introduced Lobb's time sheets for seven of the relevant 25 pay periods at trial (D.Exs. 16, 21, 26, 27, 28, 32, 33), with the explanation that they had later been found misfiled in another file. (T. 337–38).

Resolution of the issue concerning Lobb turns on the burden of proof where records of the exact number of hours worked by an employee are unavailable. In *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), the Supreme Court established a shifting burden of proof for cases in which an employer's records of time worked are inaccurate or

inadequate, in order that an employer not benefit from his failure to keep proper records. The employee must prove "that he has in fact performed work for which he was improperly compensated," *id.* at 687, 66 S.Ct. at 1192, and must produce "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference," *id.* The employer must then come forward with evidence of the exact number of hours worked or with evidence to negate the reasonableness of the inference to be drawn from the plaintiff's evidence. *Id.*

A prima facie case can be made through an employee's testimony giving his recollection of hours worked, *e.g., Reeves v. International Tel. & Tel. Co.,* 616 F.2d 1342 (5th Cir.1980), *cert. denied,* 449 U.S. 1077, 101 S.Ct. 857, 66 L.Ed.2d 800 (1981); *Mumbower v. Callicott,* 526 F.2d 1183 (8th Cir. 1975); *Hodgson v. Humphries,* 454 F.2d 1279, 1283 (10th Cir.1972); *Wirtz v. Durham Sandwich Co.,* 367 F.2d 810, 812 (4th Cir. 1966), although the court need not accept every element of the Secretary's case simply because the employer fails to produce records, *Marshall v. Lancarte,* 632 F.2d 1196, 1197–98 (5th Cir.1980); *see Hodgson v. American Concrete Constr. Co.,* 471 F.2d 1183, 1185, 1186 (6th Cir.), *cert. denied,* 412 U.S. 949, 93 S.Ct. 3007, 37 L.Ed.2d 1001 (1973); *Wirtz v. Durham Sandwich Co.,* 367 F.2d 810, 812 (4th Cir.1966). An FLSA case is not to be dismissed nor should recovery for back pay be denied, because proof of the number of hours worked is inexact or not perfectly accurate. *Marshall v. Mammas Fried Chicken, Inc.,* 590 F.2d 598, 599 (5th Cir.1979) (per curiam); *Hodgson v. Ricky Fashions, Inc.,* 434 F.2d 1261, 1263–64 (5th Cir.1970); *Mitchell v. Mitchell Truck Line, Inc.,* 286 F.2d 721 725–726 (5th Cir.1961); *see American Concrete Constr. Co.,* 471 F.2d at 1185. Where plaintiff has demonstrated

---

**2.** Contrary to a statement in defendants' post-trial memorandum, Memorandum at 9, the Government's back wage claims on behalf of Lobb involve failure to pay the minimum wage. Pretrial Order at 3, P.Ex. 2 at 20. The calculations are based on a 75-hour work week, so that there would be no minimum wage violation if only forty hours per week were worked.

For other employees, the claims are for failure to pay time and a half rather than straight time, at the regular hourly rate for hours worked in excess of 40 per week, or 86 per pay period.

that *some* work was performed for which the employee was improperly compensated, there is a right to recovery, even though the amount may be uncertain and damages difficult to calculate. *Ricky Fashions, Inc.,* 424 F.2d at 1263–64; *Mitchell v. Mitchell Truck Line, Inc.,* 286 F.2d 721 (5th Cir. 1961).

Martin Lobb testified that after about a month as a parttime rental clerk, he worked fulltime for KDC as a salesman and assistant resident manager. (T. 146–47, 160–61). His assigned hours were 9 a.m. to 8 p.m. Monday through Saturday, 9 a.m. to 6 p.m. on Sunday. (T. 147, 185). These were the hours the Kentwood office was open, and Lobb admitted he could not recall how many of these hours he actually worked. (T. 168, 171–72). He also testified, however, that he worked an average of 75 hours per week (T. 177). He stated that when there were two people to work in the office, they split the scheduled hours (T. 185).

Lobb testified that he often handled problems that came up after hours (T. 149–50) or worked on his scheduled off days (T. 186–87); he did not record this time on his time sheets. Lobb lived on the Kentwood premises.

Janice Robinson, who worked with Lobb at Kentwood for approximately six months after he became a fulltime employee, testified concerning her own hours and Lobb's. She testified that the office at the Kentwood project was open from 9 a.m. to 8 p.m. Monday through Saturday and 9 a.m. to 6 p.m. on Sunday. She stated that she and Lobb divided the office duty time more or less equally (T. 17, 22, 24, 26). She approximated her own hours at 44 to 45 per week (T. 22–23) and at 82 to 84 per pay period (T. 23).[3]

Robinson also testified that although she and Lobb had roughly the same scheduled hours in the office, Lobb was often in the office for additional hours for particular jobs he was assigned (T. 24, 26) or was working, in and out of the office, on her scheduled office days (T. 27). Sometimes she and Lobb were both in the office on weekends, the busiest time (T. 20).

I did not find Lobb's testimony completely credible. His estimate of 75 hours worked per week coincided with the number of hours the office was open, and he gave the office hours when asked what his work schedule was (T. 147–48). Some of his testimony is, however, supported by that of Janice Robinson, whom I found credible. A reasonable inference can be drawn from her testimony that Lobb usually worked more than 44 to 45 hours a week from July through December 1978. Robinson generally worked that amount of time herself, and her testimony was that Lobb worked more.

The credible testimony of Lobb and that of Robinson is sufficient to carry the Secretary's initial burden of proving that Lobb worked time for which he was not compensated and introducing sufficient evidence from which a reasonable inference concerning the amount of time worked can be drawn for the period July through December 1978.

That testimony is also sufficient to carry the Secretary's burden with respect to the later time period. Lobb testified as to his hours over the entire period, and a reasonable inference can be drawn that he worked at least the same hours, compared with the new resident manager, as with Robinson.

Defendants did not produce complete time records for Lobb to rebut the Government's case. They produced at trial time sheets, which Lobb acknowledged he completed, for eight pay periods (D.Exs. 10, 16, 21, 26, 27, 28, 32, 33). One, exhibit 10, is not within the period for which backpay is claimed.[4] The other reports show hours

---

**3.** The records of KDC show that the estimate of 44 to 45 hours per week is more accurate than that of 82–84 per pay period. For 25 semimonthly periods reported, she was paid for fewer than 80 hours four periods, 81–85 five periods, 86–90 five periods, 91–95 six periods, 96–100 three periods, and over 100 two periods (D.Ex. 7).

**4.** D.Ex. 10 covers the pay period ending May 31, 1978. The Secretary's investigation covered only June 30, 1978 to June 30, 1980, Pretrial Order at 2, and back pay for Lobb is claimed beginning July 1, 1978. The time period is

ranging from 65 to 92 for the pay periods covered. The pay periods and hours are as follows: July 15–31, 1978, 82 hours (D.Ex. 16); September 15–30, 1978, 80 hours (D.Ex. 21); November 15–30, 1978, 65 hours (D.Ex. 26); December 1–15, 1978, 83 hours (D.Ex. 27); December 16–31, 1978, 85 hours (D.Ex. 28); February 1–15, 1979, 92 hours (D.Ex. 32); February 16–28, 1979, 68 hours (D.Ex. 33). I give these documents limited weight because they represent only some of 25 relevant pay periods and because Lobb testified that he only reported office time on his time sheets.

Defendant also introduced the time reports of Janice Robinson (D.Ex. 44), Virginia Denny (D.Ex. 45) and Sandra Williams (D.Ex. 46), all of whom worked for KDC for at least part of the time that Lobb did. Robinson and Williams were resident managers at Kentwood, Robinson from before July 1, 1978 through January 8, 1979 and Williams after Robinson left until around the end of February 1979. Williams also worked for KDC in November and December 1978, apparently as a parttime rental clerk. Denny was an employee who distributed advertising fliers but also occasionally filled in at the Kentwood office. An analysis of the time sheets for days and hours when Robinson, Williams or Denny did not work in the office produces approximate minimum times for Lobb, in order for the office to be covered. These figures are minimums only, since Lobb and another may have been in the office at the same time, Lobb may have been working in the model unit or elsewhere while someone else covered the office, and Lobb occasionally worked at night after the office was closed. The analysis of uncovered office hours, based on daily hours worked by others breaks down as follows:[5]

#### 1978

| | |
|---|---|
| July 1–15 | 69.5 |
| August 1–15 | 76 |

| | |
|---|---|
| August 16–31 | 46 |
| September 1–15 | 102.50 |
| September 16–30 | 66 |
| October 1–15 | 76.5 |
| October 16–31 | 91.5 |
| November 1–15 | 62 |
| November 16–30 | 48 |
| December 1–15 | 30.5 |
| December 16–31 | 45.5 |

#### 1979

| | |
|---|---|
| February 1–15 | 79 |
| February 16–28 | 64.5 |

Many of the time sheets contain entries of Robinson or Williams for activities necessarily performed out of the office, such as walking the project or inspecting units. It was not clear from the testimony, nor is it clear from the records, whether the office had to be manned by Lobb or perhaps Denny during all these times. A few entries are of a nature as to suggest that someone else had to cover the office at Kentwood since they involved leaving the development. For example, the time sheets show some entries for going to the main office.[6] If the time records are analyzed for uncovered office time in light of these entries, the results are as follows:

#### 1978

| | |
|---|---|
| July 1–15 | 77 |
| August 1–15 | 81.5 |
| August 16–31 | 46 |
| September 1–15 | 105. |
| September 16–30 | 70.5 |
| October 1–15 | 78 |
| October 16–31 | 102.5 |
| November 1–15 | 62 |
| November 16–30 | 48 |
| December 1–15 | 32.5 |
| December 16–31 | 45.5 |

#### 1979

| | |
|---|---|
| February 1–15 | 83 |
| February 16–28 | 66.5 |

Even if the allowance is made for additional hours worked by Lobb,[7] the time

---

before Lobb changed from an hourly rate of pay to draw vs. commission, which began in June 1978.

5. There are no records for Robinson for July 16–31, 1978 and none for Williams for January 1979.

6. Robinson sometimes made the entry "Phone with CB/go to main office." Where the time is an hour or more, it has been assumed that travel, not telephone calls, was involved.

7. Lobb testified that his time was spent approximately 30% in sales and 70% in office and

records, and the inferences to be drawn from them, tend to refute Lobb's testimony that he worked 75 hours a week during this period. They do not, however, refute the Secretary's case entirely.

Charlene Baden, president of KDC, used the time reports of Robinson, Williams and Denny and a summary of them (D.Ex. 49) to show "that it wasn't necessary for Mr. Lobb or anyone else to work even a maximum of 75 hours in any one week because there were other people available to cover the office at all times." (T. 342–43). It is immaterial whether it was necessary for Lobb to work long hours, so long as he did, with the actual or constructive knowledge of his employer. An employer who knows or should know that an employee is working overtime, whether voluntary or not, cannot allow him to do so, even if no claim for pay is made. *Forrester v. Roth's I.G.A. Foodliner, Inc.,* 646 F.2d 413, 414 (9th Cir.1981); *Brennan v. GMAC,* 482 F.2d 825, 827–29 (5th Cir.1973).

Lobb testified that he did not report on his time sheets all the hours worked, only the hours in the office (T. 186–87). I find credible his testimony that he submitted time distribution reports, even though he was paid on a commission basis. One of the seven relevant reports (D.Ex. 33) shows time in excess of 86 hours in a semimonthly pay period. The time records of the other employees, which concededly were submitted to the defendant, show that there were certain periods in which Lobb necessarily worked overtime for the office to be covered. They also show duplication, or overlap, in office coverage among those employees. Defendants had at least constructive knowledge that Lobb was working overtime during this period, even though not necessarily the precise number of hours.

It should be noted that an employee is to be compensated for time spent predominantly for the employer's benefit. *E.g., Marshall v. Partida,* 613 F.2d 1360, 1362 (5th Cir.1980). Waiting time may be working time, depending on the particular factual circumstances. *E.g., id.; Irwin v. Clark,* 400 F.2d 882 (9th Cir.1968), *cert. denied,* 393 U.S. 1062, 89 S.Ct. 715, 21 L.Ed.2d 706 (1969). Lobb admitted on cross-examination that during at least part of his time at KDC, he spent one or two hours a day working on a book for Alex Laurins. If this was done in the office on scheduled duty time, when he had no duties to perform except to wait for telephone calls or visits, it would be compensable time.

The case with respect to Lobb is problematic, as FLSA cases often are, because of the lack of precision on the number of hours worked. It is clear, however, that if sufficient evidence exists for approximating hours worked, this Court must simply do the best it can. *See Hodgson v. Ricky Fashions, Inc.,* 434 F.2d 1261, 1263 (5th Cir. 1970). The testimony of Robinson, together with her time records, supports a finding that Lobb worked approximately 54 hours per week during the period July 1 through December 31, 1978 and, by inference, during the remaining period of his employment. This figure has been obtained by adding to Robinson's average 44 hours per week 10 hours, representing average extra time worked by Lobb on special assignments and sales activity and helping cover the office on weekends.

For 54 hours per week, Lobb was not paid the minimum wage.[8] He regularly received $500 per month, plus a rent-free apartment worth $200 a month. Converted to a weekly basis, his compensation was $161.54 weekly. The amount due as minimum wage for 1978 is computed as follows:

other work at the development (T. 167) and that the "sales" hours and others were not reported (T. 186–87). At another point he confirmed prior deposition testimony that the sales work took approximately 10 hours per week (T. 449). Although Robinson gave no particular hours, her testimony indicates that some allowance for extra time worked by Lobb should be made.

**8.** The Secretary proceeded against KDC with respect to Lobb on the basis of failure to pay minimum wage, and back pay has been computed using that method in light of the findings made as to number of hours worked.

$$54 \times 2.65 = \quad 143.10$$
$$14 \text{ (OT)} \times 1.325 = \quad \underline{18.55}$$
$$161.65$$
$$-\ \underline{161.54}$$
$$.11 \quad \text{per week}$$
$$\times \ \underline{26} \quad \text{weeks}$$
$$\$ \ \overline{2.86}$$

The amount due for 1979 is as follows:

$$54 \times 2.90 = \quad 156.60$$
$$14 \times 1.45 = \quad \underline{20.30}$$

$$176.90$$
$$-161.54$$
$$\overline{15.36}$$
$$\times \ \underline{17} \quad \text{weeks}$$
$$\overline{261.12}$$

### Limitations and liquidated damages

Back pay may be recovered under the FLSA for two years before suit, three years if the violation is willful. 29 U.S.C. §§ 216(b), 255. Liquidated damages in an amount up to the amount of back wages are generally to be awarded. *Id.* § 216(b); *e.g., Richard v. Marriott Corp.,* 549 F.2d 303, 305 (4th Cir.) *cert. denied,* 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1100 (1977). Section 260 provides a limited exception:

> [I]f the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

29 U.S.C. § 260.

Defendants argue that Ms. Baden acted in good faith, in relying on the "clear language concerning the exemption of the 'ultimate consumer' in the Act as amended, in absence of a clear statement by the Wage and Hour Administration [explaining its reading of the statute]." Defendants' Memorandum at 11. They urge that Ms. Baden did not know and was not told of any such interpretation and therefore did not act willfully.

▮ A violation of the FLSA is willful, and back pay for three years will be awarded, if the employer knows, or has reason to know, that his employees are subject to the act. *E.g., Laffey v. Northwest Airlines, Inc.,* 567 F.2d 429, 459–62 (D.C.Cir. 1976); *Brennan v. Heard,* 491 F.2d 1 (5th Cir.1974). Eleanor Samuda, a Wage and Hour compliance officer, testified concerning an employee complaint against KDC received in the Hyattsville, Maryland office on January 27, 1978. In handing the complaint Ms. Samuda contacted Ms. Baden and explained coverage (T. 126, 133–34), and the complaint was resolved (T. 134). Her testimony indicates that defendants certainly had knowledge that KDC employees were subject to the Act, whether or not they believed later that KDC was not, as a matter of law, covered. Back pay will be awarded for the three year period.

Defendants' argument also goes to the appropriateness of liquidated damages. They do not rely on an agency ruling of noncoverage. *Cf. Clifton D. Mayhew, Inc. v. Wirtz,* 413 F.2d 658 (4th Cir.1969) (reliance on past written interpretation by agency a defense). Rather, the argument seems to be that in light of the "clear" language of the statute, the agency had an obligation to advise that it viewed the 1974 amendments to the act as expanding coverage. Although Ms. Baden testified that she believed the FLSA was not applicable to KDC because of the ultimate consumer language, there was no testimony that she consulted with agency personnel or an attorney. The recent contact with Samuda should have made it obvious that there was at least a serious question concerning coverage. Mr. Kinsley testified, and I find his testimony credible, that Baden conceded coverage at their initial meeting. The argument of a good faith belief that KDC was not covered has all the earmarks of an after the fact rationalization for defendants' actions. In any event, defendants failed to meet their " 'plain and substantial' " burden of demonstrating that the violations were in good faith and based on reasonable grounds. *See Wright v. Carrigg,* 275 F.2d 448, 449 (4th Cir.1960). Liquidated damages equal to back pay will be awarded.

## Recordkeeping

■ The FLSA requires that employers subject to its provisions make and keep records of wages, hours and other conditions and practices of employment prescribed by the Secretary of Labor. 29 U.S.C. § 211(c). The administrative regulations provide that no particular form is necessary, so long as the pertinent information is kept. 29 C.F.R. § 516.1 (1979). The employer must maintain records on employees to whom the minimum wage and overtime provisions apply containing, among other information, the following: the regular rate of pay for any week when overtime is due, *id.* § 516.2(a)(5), the basis on which wages are paid, *id.* § 516.2(a)(6); hours worked per day and week, *id.* § 516.2(a)(7); total daily or weekly straight-time earned, *id.* § 516.2(a)(8), total overtime, *id.* § 561.-2(a)(8); deductions, *id.* § 516.2(a)(10); and total wages, *id.* § 516.2(a)(11). The testimony of David Kinsley concerning the KDC records he examined was sufficient to establish failure to comply with the recordkeeping requirements with respect to Martin Lobb. His testimony was confirmed by the exhibits introduced by defendant (D.Exs. 10–37). This was apparently not done because of defendants' belief that Lobb, or the company, was not covered by the FLSA. There is, however, no "good faith" defense that excuses violation of the recordkeeping provisions of the Act. *Dunlop v. Gray-Goto, Inc.,* 528 F.2d 792, 796 (10th Cir.1976).

## Injunctive Relief

■ KDC is now a non-operating corporation with no employees, having sold all the mutual ownership contracts for the development by 1980. Defendants urge that injunctive relief is not appropriate. The corporation is not defunct, however, and one obligation it will have under this opinion is the payment of back wages. Injunctive relief is appropriate to enforce that obligation, but inappropriate as to future violations by KDC, which are unlikely. *See Marshall v. Gerwill, Inc.,* 495 F.Supp. 744, 756 (D.Md.1980); *Marshall v. R & M Erec-tors, Inc.,* 429 F.Supp. 771, 783 (D.Del.1977); *cf. Brennan v. Thor, Inc.,* 516 F.2d 999 (4th Cir.1975) (per curiam) (change in ownership and three-year compliance record justified lifting injunction).

## Summary

Defendants are liable for overtime wages not paid to the employees listed in paragraph 4(b) of the pretrial order in the amounts claimed. These employees were paid only straight time at the regular rate for hours worked in excess of 40 per week, a violation of 29 U.S.C. § 207. Defendants conceded that if they were covered by the FLSA overtime was owed to these employees. The amounts due are as follows:

| | |
|---|---|
| Carlos Lance Allen | $ 49.38 |
| Mates Appollon | 45.00 |
| Kenneth Blankenship | 17.13 |
| Joseph V. Brown | 103.53 |
| Vanessa Brown | 129.50 |
| Virginia Denny | 171.75 |
| Lewis Dismuke | 19.00 |
| Harry Dunbar | 107.26 |
| Bernadine Evans | 30.63 |
| Bernice Felus | 164.57 |
| Andre Fisher | 17.00 |
| Wayne Freeland | 71.50 |
| Freddie B. Hardy | 22.50 |
| Greg Humphries | 72.00 |
| Mark Hunter | 26.25 |
| Charles Edward Jackson | 37.00 |
| Harry Laws | 16.00 |
| Cecil Raemsch | 32.00 |
| Elory B. Royall | 31.50 |
| Terrence Andre Sumby | 47.00 |
| Robert Leaon Taylor | 15.94 |
| Keith Tyree | 49.88 |

Liquidated damages in an equal amount are awarded.

Defendants are liable for overtime wages not paid to seven employees for whom an administrative exemption was argued in the amounts claimed. These employees were paid on an hourly, rather than a fixed salary, basis, so the exemption does not apply. They were paid only straight time, rather than time and a half, for overtime hours. The amounts due are as follows:

| | |
|---|---|
| Tanya Carol Hale | $ 337.25 |
| Frank Harris | 215.50 |
| Winona Hale Mahoney | 131.23 |
| Terry McWilliams | 148.75 |
| Janice Robinson | 112.75 |

Franklin Tyree 366.00
Kathy Warren 58.00

Liquidated damages in an equal amount are awarded.

Defendants are liable for back wages not paid to Martin Lobb in the amount of $263.98. Liquidated damages in an equal amount are awarded.

Injunctive relief will be denied as to future violations with respect to KDC, in light of its present status. Because Charlene Baden is or may be in a position to commit future violations, injunctive relief as to prospective violations will be granted as to her.

## ORDER

For the reason set forth in the foregoing Memorandum, it is, this 29 day of June, 1982 by the United States District Court for the District of Maryland, hereby

ORDERED:

1. That judgment in the amount of $5,819.56, representing $2,909.78 back pay due the employees named in the foregoing memorandum in the specific amounts listed and liquidated damages in an equal amount, is hereby entered in favor of the plaintiff against both defendants;

2. Back pay shall be paid to the employees, and defendants are hereby enjoined from failing to pay to any of the named employees the compensation found to be due each in the foregoing memorandum;

3. That defendant Charlene Baden is hereby enjoined from future violations of the overtime, minimum wage and record-keeping provisions of the Fair Labor Standards Act.